KERENS NATIONAL BANK ET AL. v. W. T. STOCKTON, IND. EXEC., ET AL.

No. 4575. Decided June 10, 1931.
(40 S. W., 2d Series, 7.)

*Richard Mays* and *A. P. Mays,* of Corsicana, for appellants.

The judgment in the case of Stockton v. Morris is void, and at least voidable, in so far as it undertook to shift the homestead of L. M. Morris upon land upon which it did not exist at and prior to the time of his death.

There is no such uncertainty in the will of Morris, relating to the power and duties of Stockton, as independent executor, as gave the court jurisdiction to determine the matters presented by the pleadings in the suit of Stockton v. Morris, for which reason the judgment is void and is at least voidable.

Morris' insurance money was subject to the payment of appellants' debts, for the reason that while his minor children were named as beneficiaries in the policies of insurance, yet, prior to his death, Morris, the insured, had by his will changed the beneficiaries from his children to his estate, and disposed of said moneys in his will. And his children being put to an election by the terms of the will, and having accepted thereunder, they had no other interest in the insurance money, except as they took it under the will and as a part of the estate of their deceased father.

The evidence was at least sufficient to raise an issue relating thereto, and the court below committed reversible error in directing a peremptory instruction against appellants and in favor of appellees.

The judgment in the case of Stockton v. Morris is void and is at least voidable in so far as it adjudges that Stockton as trustee may elect to pay himself as executor the life insurance money and dispose of it as executor in the payment of secured debts of Morris, deceased, if he deemed it to be for the best interests of his wards, but that the court had no authority to force him to make such payments.

The judgment in the case of Stockton v. Morris is void and is at least voidable in so far as it adjudged that the $11,937.35 insurance money, then in the possession of Stockton, as guardian of Morris' children, be divested out of them and vested in Stockton as trustee for the reason that Stockton had qualified as guardian of the estate of said minor children and if the insurance money belonged to them the probate court of Navarro county having jurisdiction of said minors and their property had the exclusive jurisdiction and power to deal with said property and not the district court.

Appellants were lien creditors of L. M. Morris, deceased, by force of the law, which declares that the property of a decedent shall descend

charged with the payment of his existing debts in the hands of his heir and beneficiary.

In any event, at least 75 acres out of the 275 acres on the Henderson survey, worth $125 an acre, and the 20 acres on the Shed survey, worth $100 an acre, and the insurance money in the sum of $11,937.35, is subject to the payment, pro rata, according to proper classification, among those of Morris' creditors who asserted, preserved and perfected their indebtedness against his estate, and according to the principles of equity, the community land lien creditors of Morris and his deceased wife, Rosetta P. Morris, would not be permitted to absorb Morris' interest in the land, but would require a valuation of the interest of Rosetta P. Morris, and apportion the amount L. M. Morris' portion would be subjected to, having regard to the rights, liens and equities of his other creditors, including appellants (Clement v. Bank, 259 S. W., 561; Harrison v. Bank, 238 S. W., 209).

The court having rendered judgment in favor of appellant, Kerens National Bank, for the amount of its debt, and it also appearing that the other appellants had obtained judgments for their several debts against Stockton, executor, and the estate of Morris, and appellants being lien creditors, and it appearing without dispute that there was property of the estate subject to the payment of their indebtedness, the trial court erred in not declaring and foreclosing said liens and entering such judgment as that the property of the estate, subject to the payment of said debts, could be properly applied in satisfaction thereof.

*Prince & Taylor, Callicut & Johnson* and *Upchurch & Howell,* for appellees.

The cause of action to construe a will is separate and distinct proceeding in equity. In such proceeding necessary parties are well defined and enumerated in the law, and the creditors of the estate have no legal interest or voice in saying what the terms of the will mean, but that is left entirely to the district court and the parties to the will, and when the district court passes on it, its construction of the will is taken in law to be what the maker of the will intended, and such construction is not a limitation of any right of creditors, and therefore, they are not necessary parties to construe the will, nor can they in a separate suit or in the original suit set aside the construction of such will.

Where an insurance policy names a beneficiary, who survives the insured, and who has an insurable interest, the proceeds of the policy form no part of the estate of deceased, and neither his executor or his creditors have any claim upon the proceeds. Classen v. Freeman, 236 S. W., 979; White v. White, 32 S. W., 48; Mullens v. Thompson, 51 Texas, 7; Red River National Bank v. DeBerry, 105 S. W., 998.

The 275 acres of the Henderson survey was community property of L. M. Morris and his first wife. The purchase money notes of $12,000

was a personal obligation of L. M. Morris, and could be satisfied out of his estate if he had sufficient property. The said notes were no personal obligation against his wife, Rosetta P. Morris, the mother of the minor appellees. Upon the death of Rosetta P. Morris her ½ of the 275 acres vested in fee in these minor appellees and their sister who is now married, and while said ½ can be subjected to the payment of the purchase money, yet if the father's ½ is sufficient for the purpose it must be resorted to for that purpose. Leatherwood v. Arnold, 66 Texas, 417; Simkin's Adm. of Estates, 2nd Ed., 518.

The homestead of a second wife must come out the estate of the deceased husband, and not out of the community property of him and his first wife. Pressly Heirs v. Robinson, 57 Texas, 453; Crocker v. Crocker, 46 S. W., 870; Gilliam v. Null, 58 Texas, 298.

Mr. Chief Justice CURETON delivered the opinion of the court.

L. M. Morris and his first wife, Rosetta, owned a 275 acre tract of land out of the Henderson survey in Navarro county, subject to a vendor's lien for a large sum. The wife died, leaving surviving the husband and six minor children. Thereafter Morris purchased a 20 acre tract of land out of the Shed survey. He then married again, and with his second wife, Etta, and his five minor children (one of his children having married), lived on the 275 acre tract. Morris died, leaving a will. The will, omitting formal parts, reads:

"1. I desire that my body be buried in a decent Christianlike manner suitable to my circumstances and condition of life.

"2. I desire that all my just debts be paid out of my estate without delay.

"3. Subject to the limitations mentioned below and the powers hereinafter given my executor and guardian hereinafter named, I give and benqueath to my six children, viz: Oma Gladys Morris (born Dec. 4, 1900), Margaret Emily Morris (born Apr. 5, 1904), Marshall Barnett Morris (born Nov. 3, 1906), Dela Mae Morris (born Jan. 6, 1911), Phillip Wayne Morris (born Aug. 13, 1912), and William Glen Morris (born Aug. 30, 1914), all my property both real and personal, share and share alike, in fee simple forever. Should either of them die before I do without leaving children, then such part as would go to such deceased child or children, shall go, share and share alike, to the others then living. Should any of them be then dead, but then having living children, the child or children of such deceased shall receive its parents part of my estate, subject to the conditions imposed herein on its parent.

"4. It is my will that my estate be not partitioned among my said children before the youngest one of my then living children shall be twenty-five years old. Three years after the marriage of either of them, as to such child, it shall be deemed, for the purpose of this section of my will, as being twenty-five years old.

"5. My property on this date, subject to section six hereof, is community property of myself and deceased wife, Rosetta P. Morris, but it is my desire that all of said community property be held under the terms of this my will as wholly mine, and should any one or more of my children or grandchildren, taking under this will, not agree to and abide by the terms of this my will, then my executor hereinafter named shall deliver to such devisee or devisees the part of the estate such nonconsenting party or parties would have inherited from the said Rosetta P. Morris, only, and no part of my estate or life insurance shall pass to such party or parties not consenting to the terms of this my will.

"6. My life insurance is payable to my said children (or their guardian), and is to be subject to the control of the guardian I hereinafter appoint for them. I here give such guardian full authority to collect said insurance and to keep the same together as stated under section five hereof, and also to use the same in paying any lien or debt against any property passing to said children by this will. He shall have full power to loan the same on first mortgage on real estate, not exceeding in amount fifty per cent of the value of such real estate; to purchase land with the same; to collect such money so loaned; to sell said land so purchased, and to reinvest such money from time to time in like manner as he shall see fit. Any other funds he may have on hand belonging to them are also to be held and controlled by this section of my will.

"He shall have the right to pay for legal services necessary, in his opinion, to guide him in his acts as guardian or as executor. At his election, he may use said funds in any lawful manner, as executor of my estate, after they are collected, as fully as though such insurance was payable to my estate instead of to my said children.

"7. My executor shall have power to sell any land necessary, in his judgment, to best conserve my estate for my said children, or to pay my debts, and to reinvest the proceeds thereof as stated in section six hereof and under the conditions therein imposed.

"8. It is my will that the guardian of my said children give my said children an education suitable to their status and condition, in so far as he may be able, out of my estate, and for such purpose shall have the right to use the interest and corpus of my estate.

"9. I hereby appoint my friend, W. T. Stockton, to act as guardian of my said children, during their minority, and having full confidence in him, I direct that he act independent of the probate court, and that no bond or other security be required of him as such guardian. When my money is collected by him for them as guardian, he may then, at his election pay it to my said executor and thereafter handle it as such.

"10. I nominate and appoint my said friend, W. T. Stockton, to be executor of this my will, and direct that no security or bond be required of him as executor.

"11. It is my will that no action shall be had in the county court in the administration of my estate other than to prove and record this will, and to return an inventory and appraisement of my estate and list of claims. He is to pay himself reasonable compensation for his services."

Stockton accepted the trust imposed by the will, and instituted suit in the district court of Navarro county to have the will construed. The decree in that case, among other things, declared that: "* * * the widow, Etta Morris, and the minor children of L. M. Morris, deceased, have, and they are hereby given, and have set aside to them for their use and benefit (but subject to the purchase money liens againt same as provided by law) as a homestead, 157½ acres of land, to-wit, the said 20-acre tract and an undivided one-half interest in and to the 275-acre tract to be used and shared by them as their homestead as provided by law in such case, so long as same is so used and occupied by them as required by law to hold a homestead acquired by inheritance as in this instance."

The decree also disposed of all debts owing by Morris, as follows: "That the estate of L. M. Morris, deceased, is insolvent and that there are no debts against said estate which are binding or collectible (except the first class claims and costs herein as found above) save and except the debts secured by lien on property belonging to said estate, and said W. T. Stockton is without power and shall not pay any debts against said estate except debts secured by liens at the death of L. M. Morris (and said first class debts and costs herein) and shall pay each only to the extent of its security."

Kerens National Bank and the other plaintiffs in error, as plaintiffs and interveners, respectively, in the instant case sought to set aside this advisory judgment and to establish and foreclose their liens as creditors of the deceased. The plaintiff and interveners were not parties to the Stockton-Morris suit. The trial court instructed a verdict for the plaintiff for its debt, $2,383.38, but otherwise in favor of the defendants and against the plaintiff and all interveners. On appeal the Court of Civil Appeals affirmed the judgment in part and reversed the same in part, and remanded the cause with instructions. 281 S. W., 580.

The Court of Civil Appeals prepared an admirable opinion, with which we find ourselves generally in accord. We will therefore refer to that opinion for a full statement of the case, and treat it as the law of the case, except as modified by this opinion. That court correctly held, in effect, that the advisory decree in the suit brought to construe the will was not binding on the creditors of the Morris estate, in so far as it declared that claims other than secured debts should not be paid, and that the question as to the existence of an excess of property over the secured debts was subject to judicial examination in the present case. It therefore in part reversed the case, but in doing so held that the children of the testator were entitled to a homestead of 200 acres out of the land

owned by the estate, instead of 157.5 acres as allocated to them by the advisory decree.

We think this holding of the Court of Civil Appeals was error, but we predicate the conclusion of error wholly upon the fact that the defendants in error neither in the trial court nor in the appellate court requested an increase of the number of acres of land awarded by the advisory judgment of the district court to the heirs of L. M. Morris as a homestead. Neither the heirs nor their representative appealed from the advisory decree, nor have they in this case by any assignment of error complained of the action of the trial court in approving the original allotment to the heirs of 157.5 acres as a homestead. Under this state of the record it was error for the Court of Civil Appeals to increase the award to the heirs. 3 Texas Jurisprudence, p. 802, sec. 569.

The land involved was 295 acres, or 137½ acres in excess of the homestead allotment. We agree with the Court of Civil Appeals that this excess may be sold in satisfaction of the debts of Morris, and that from its proceeds there must first be paid, if it produces so much, the entire vendor's lien debt against the whole tract, including the homestead. In other words, before anything out of this excess land becomes available for the payment of the general creditors of the estate, the vendor's liens against the entire 295 acres must first be paid therefrom in the interest of the homestead claimants. 29 Corpus Juris, p. 877, sec. 242(4), p. 1013, sec. 504; Prigden v. Warn, 75 Texas, 588, 15 S. W., 559; Mackey v. Wallace, 26 Texas, 526; Harrison v. Obertheir, 40 Texas, 385; Chandler v. Young (Texas Civ. App.), 216 S. W., 484; Pease v. Randle (Texas Civ. App.), 191 S. W., 566; Pugh v. Whitsitt (Texas Civ. App.), 161 S. W., 953; King v. Hapgood Shoe Co., 21 Texas Civ. App., 217, 51 S. W., 532; Interstate Building, etc. Association v. Tabor, 21 Texas Civ. App., 112, 51 S. W., 300; Henkle v. Bohuke, 7 Texas Civ. App., 17, 26 S. W., 645; Colwick v. Wright (Texas Civ. App.), 275 S. W., 152, 155; Deaton v. Southern Irr. Co. (Texas Civ. App.), 144 S. W., 294; Nolan v. Nolan, 155 Calif., 476, 482, 101 P., 520, 523; Freeman on Executions (3d Ed.), vol. 3, sec. 440; Pomeroy's Equity Jurisprudence (2d Ed.), vol. 5, sec. 2292.

In Corpus Juris, supra (sec. 242), the rule is stated as follows:

"In some jurisdictions, in the absence of special statutes so providing, a person who has a lien on land superior to a debtor's right of homestead need not resort to other property of the debtor before the homestead may be sold. On the other hand in most jurisdictions, usually by reason of statute so providing, all nonexempt property of the debtor, both real and personal, must be exhausted before the homestead can be sold; and it has been held that a debtor may insist that recourse shall last be had to the homestead property, and that the lienholder whose security effects the homestead with other land shall resort, first, to the other lands, even

though by so doing the security of other creditors on the same land may be impaired or destroyed."

Texas has no statute on the subject, but the rule declared is accepted by our courts, as shown by the authorities cited.

In the case of Henkel v. Bohenke, supra, the Court of Civil Appeals in part said:

"It is a rule of equity that where a person has a lien upon two or more funds to secure the payment of a debt, or one of which funds another person has a similar lien, the holder of the first lien is required to satisfy his lien, so far as he can, from those funds on which the other has no claim; and the same doctrine applies where the same person is the holder of the several liens, in marshaling the assets so as to secure the satisfaction of all his claims. But the court below, in the application of this equitable doctrine, disregarded the homestead rights of the defendant, which should have been taken into account. This right should be considered either as an incumbrance on the land, to be classed in the order in which it arose, which was next to the lien for the purchase money, or as creating an exemption or limitation to the equitable doctrine of marshaling assets because of injustice to the debtor, who, as the head of a family, is entitled, under our exemption laws, to have his homestead protected from sale, except, as in this case, for the purchase money. The practical effect of the judgment of the district court is to have the homestead sold for the satisfaction of the mortgage, which was executed subsequent to the acquisition thereof, and invalid as to so much of the land as might be included in the homestead. The exemption of the homestead from forced sale will protect it from the application of the rule of equity above stated. Colby v. Crocker, 17 Kan., 527; La Rue v. Gilbert, 18 Kan., 220; McLaughlin v. Hart, 46 Cal., 638; Brown v. Cozard, 68 Ill., 178; McArthur v. Martin, 23 Minn., 74; White v. Fulghum (Tenn.), 10 S. W., 501; Dickson v. Chorn, 6 Iowa, 19, 7 Am. Dec., 382; Marr v. Lewis, 31 Ark., 203, 25 Am. Rep., 553; McCreery v. Schaffer, 26 Neb., 173, 41 N. W., 996; Bank v. Harding, 86 Iowa, 153, 53 N. W., 99; Flowers v. Miller (Ky.), 16 S. W., 705. A different conclusion, however, has been reached in some other states. See Thomp. Homest. & Ex., sec. 656 et seq., to which may be added Bowen v. Barksdale, 33 S. C., 142, 11 S. E., 640. But the protection of the homestead in such case is supported by the greater weight of authority, and is more in consonance with the exemption laws of this state, if, indeed, the application of the doctrine contended for does not come within the positive prohibition of the constitution and laws exempting such property from forced sale."

Many sessions of the Legislature and three codifications of the statutes have taken place since the rendition of this opinion in 1894, without any change in the homestead laws in so far as there interpreted. The readoption of our homestead status in the codes without change must be regarded

.as an adoption of the construction placed thereon in this opinion, and that shown in other opinions rendered prior to the several revisions of the statutes. ·25 R. C. L., p. 1075, sec. 297. Moreover, this opinion and others cited are clearly consistent with what this court had previously said on related questions as shown by the authorities supra.

In 1899 the question again came before the Court of Civil Appeals in the case of King v. Hapgood Shoe Co., cited above. King owned two buildings, which adjoined. One of them was his homestead, but there evisted a valid mechanic's lien upon both. The Shoe Company was a creditor, and after reducing its debt to judgment filed an abstract of judgment, and brought suit to subject both buildings to its debt and lien. The holder of the mechanic's lien on all the property was made a party. The three-story building was found to be the homestead of King, and, of course, the Shoe Company's lien did not attach to it. The question decided was whether or not the holder of the mechanic's lien could be required to first subject the exempt property (against which the Shoe Company did have a judgment lien, inferior, of course, to the mechanic's lien) to the collection of its debt. The court held that King had the right to require the sale of the non-exempt property first, saying: "The defendant King requested the court to require the bank, in the enforcement of its lien, to sell first .that portion of the property which was not exempt from forced sale, and. this, as we have seen, the court refused to do; and in this, we think, the court committed an error for which the judgment must be reversed. Under the authority of Pridgen v. Warn, 79 Texas, 588, 15 S. W., 559, we are constrained to hold that it was the right of the defendant King to have the property not exempt from execution sold, and the proceeds applied to the discharge of the mechanic's lien, before selling his homestead."

In the case of Chandler v. Young, 216·S. W., 484, 486, the Court of Civil Appeals in part said: "It is the settled policy of this state to protect homesteads from forced sales. This includes the policy of encouraging the acquisition of homesteads, where it can be done without injustice to those who have acquired liens upon lands subsequently dedicated to homestead purposes.

"When appellants established their homestead, upon the lands previously mortgaged, their homestead right became perfect, except as to the right of the mortgagee to collect her debt from the proceeds of such land. If this can be done, without selling the homestead equity, conforming to public policy, requires that it shall be done. King v. Hapgood, 21 Texas. Civ. App,, 217, 51 S. W., 532, 535; Henkel v. Bohnke, 7 Texas Civ. App., 16, 26 S. W., 645; Pridgen v. Warn, 79 Texas, 594, 15 S. W., 559."

In Colwick v. Wright, 275 S. W., 152, 155, the Court of Civil Appeals, in an opinion by Chief Juustice Gallagher, followed the rule,

saying: "Ordinarily, an execution creditor holding a junior lien on a part only of property incumbered by a prior lien has a right, under the equitable rule of marshaling assets and securities, to require the prior lien to be satisfied out of that portion of the property not subject to his lien, and if such property is insufficient to satisfy such prior lien in full, to have the proceeds of the sale of the same applied as a credit thereon. This right, however, is an equitable one, and, by the great weight of authority, will not be applied to defeat homestead or other exemptions. In case of such exemptions, the debtor has a right to have the non-exempt property included in the primary incumbrance exhausted in satisfaction thereof, before resort is had to his exempt property. Pridgen v. Warn, 79 Texas, 588, 15 S. W., 559; Henkel v. Bohnke, 7 Texas Civ. App., 16, 26 S. W., 646, 646; 26 Cyc., 933."

The Supreme Court of California in 1863 announced the rule adhered to by us in this opinion. In 1909 the question was again reviewed by that court, in the light of long experience and judicial action by other states, and the rule as previously adopted by that court was approved. In the case referred to, Nolan v. Nolan, supra, the court in part said:

"The doctrine of the marshalling of assets and securties is of equitable creation, and in its early application was considered solely with regard to the respective rights of the creditors. The debtor was given no hearing and allowed no voice in the matter. '1 Story's Equity Jurisprudence, secs. 640 et seq.) It was to many courts a startling and reprehensible extension of the doctrine, when it was first announced that the creditors' rights could be interfered with by an equity arising in favor of the husband or wife by virtue of a homestead. Of the states which announced this extension California was among the earliest, if not the first. In Bartholomew v. Hook, 23 Cal., 277 (decided in 1863), a judgment had been recovered against the husband, and it had become a lien on his land. Subsequently the wife filed a declaration of homestead upon the land, and it was by this court decided that, though the creditor could have recourse to the homestead property if necessary for the recovery of his debt, yet the wife had, by her declaration of homestead, acquired such an interest in the land as to justify her in maintaining an action against the sheriff to compel him first to resort to the other property of the debtor husband before proceeding against the homestead. Following this came the case of McLaughlin v. Hart, 46 Cal., 639 (decided in 1873), which held that where A and his wife had given to B a mortgage upon a tract of land, upon fifty acres of which there was a declaration of homestead, and subsequently A had given mortgages upon the same land, excepting the fifty acres affected by the homestead, to C and D, upon foreclosure proceedings the junior mortgagees could not compel B to resort first to a sale of the homestead, to the end that their security might not be impaired; but, to the contrary, A and his wife, by the equity of their homestead, could compel B first

to resort to and exhaust the lands not affected by it, even though the result of such procedure would be the destruction of the security of C and D. The justice of this determination was soon recognized and declared in McCreery v. Schaffer, 26 Neb., 173, 41 N. W., 996; Colby v. Crocker, 17 Kan., 527; Brown v. Cozard, 68 Ill., 178; McArthur v. Martin, 23 Minn., 74; Mitchelson v. Smith, 28 Neb., 583, 44 N. W., 871, 26 Am. St. Rep., 357; White v. Fulghum, 87 Tenn., 281, 10 S. W., 501; Equitable Life Ins. Co. v. Gleason, 62 Iowa, 277, 17 N. W., 524; Flowers v. Miller (Ky.), 16 S. W., 705; Wilson v. Patton, 87 N. C., 318.

"\* \* \* \* \* \*

"Notwithstanding some contrariety of opinion, it may be said that, by the great weight of authority, the debtor who has mortgaged an existing homestead will be heard, upon a marshalling of securities, to insist that recourse shall last be had to the homestead property; that a lienholder, whose security affects the homestead with other land, will, at the instance of the debtor be compelled to resort first to the other lands, even though by so doing the security of still other creditors upon these other lands is impaired or destroyed. Mr. Freeman considers the question in the following language: 'The more reasonable view is, that the equities of the homestead claimants to retain their home are at least equal to that of the creditors to have it sold, and therefore that chancery will not aid the latter by compelling the judgment creditor to first resort to the homestead. Perhaps a more difficult question is: May one who has a lien on the homestead and other property be compelled by the homestead claimants to first resort to the latter? On the one side, it is insisted that the right to compel a marshalling of assets never existed in favor of judgment debtors, but only in behalf of persons claiming under them, and that the creation of the lien by the homestead claimants was, in effect, an agreement on their part that the lienholder might at his discretion sell any of the property which was subject to such lien, and that such agreement precludes such claimants from exercising any control over such discretion. But homestead laws should be liberally construed, and no intention should be presumed, nor should any interpretation be indulged, which is at variance with the natural and obvious purpose of the parties. The claimants, in the absence of any expression of a contrary intent, should be presumed to intend no further peril to their homestead than necessity demands, while he who receives a mortgage from them should be regarded as obtaining a mere security for his debt, and not the right to employ that security in such a mode as to needlessly imperil the homestead.' (2 Freeman on Executions, 440). This right of the homestead claimants, as we have seen, is one which they may exercise even to the detriment of junior encumbrancers of the other lands. This is so, upon the principle that they have taken their junior encumbrances with knowledge of the

equities which the homestead carries, amongst which is the important one to direct the senior mortgagee to have recourse first to lands other than the homestead. That the weight of authority supports this view, in accordance with the early enunciation of this court in McLaughlin v. Hart, 46 Cal., 639, may be seen by an examination of the authorities collated in 26 Cyc., 933; 19 Am. & Eng. Ency. (2d Ed.), 1269; 34 Century Digest, col. 357, 359, sec. 3."

This is the first time that the question has been directly presented to this court, and we deem the quotations made appropriate, although this opinion is lengthened thereby.

We agree with the Court of Civil Appeals that the insurance money involved belonged to the heirs of Morris, and that the same constituted no part of his estate out of which the plaintiffs in error had the right to seek payment of their debts. The effect of the will, together with the acceptance by the heirs thereunder, was to create a testamentary trust for the benefit of the heirs, with the control of the insurance funds by the trustee or guardian, and to be exercised by him for the benefit of the heirs. The will says so in so many words. In paragraph 6 of the will the testator defined the authority which he was conferring upon the guardian or trustee with reference to this insurance money. He gave the guardian authority: first, to collect said insurance; second, to use the same in paying any lien or debt against the property passing to his children by the will. The guardian was given full power to loan the money on a certain class of mortgages, and within certain limitations to purchase the land, to collect the money loaned, to sell the land purchased, and to reinvest the money. He was likewise authorized to pay for legal services. Then follows the only clause which the Court of Civil Appeals thought standing alone could reasonably be said to make the insurance money available for the payment of general creditors. This clause, a part of section 6 of the will, referring to the insurance money, reads:

"At his election, he may use said funds in any lawful manner, as executor of my estate, after they are collected, as fully as though such insurance was payable to my estate instead of to my said children."

It is to be noted that this clause merely confers a discretionary power upon the executor, to be exercised for the purpose of effectuating the primary trust confided to him; which was, of course, to care for the property of the children. Had the testator intended that this insurance money should become a part of his estate for all purposes, he could have used very simple language to express that purpose, by stating that, although his insurance policies were payable to his heirs, yet his desire was that the same should become a part of his general estate, subject to all its liabilities. He did not do this, however, and we must assume from the care with which his language was apparently selected that his statement that his life insurance was payable to his children, but should be subject to the

control of. the guardian, meant that, although it was the property of his children, it would be subject to the control of the guardian for the purpose of effectuating the trust imposed by the will, for the period of time designated in paragraph 4 thereof. We think it unnecessary to discuss this question at length. The Court of Civil Appeals has disposed of the issue for reasons plain and satisfactory. To what it has said we will add, however, that since the language above quoted from the will makes the insurance money available for use "in any lawful manner, as fully as though such insurance was payable to my estate", only at the *"election"* of the executor, it necessarily follows that it is not so available under the will until the executor has elected to make it so. The word "election" signifies a free choice. New v. Smith, 94 Kan., 61, 145 P., 880, L. R. A., 1915F, p. 771. If other portions of section 6 of the will, which makes disposition of the insurance fund, or any other part of the will, were intended to make this fund a part of the decedent's estate for all purposes, there would have been no choice for the executor, guardian, or trustee to make,—nothing for him to make an "election" about. Upon the whole, we are convinced that the insurance money is not available for the payment of debts except at the election of Stockton.

The plaintiffs in error insist that certain personal property of the estate lawfully subject to the payment of debts passed into the hands of Stockton. There are no fact findings before us as to this matter, and we refrain from discussing the question. We are reversing the case generally, and this issue may be determined on the next trial.

The Court of Civil Appeals affirmed in part and in part reversed, the case with instructions. We believe, under all the facts, that justice will be better subserved by reversing the case generally as to all issues and parties. The judgments of the Court of Civil Appeals and of the district court are both accordingly reversed, and the cause remanded to the district court for trial in accordance with this opinion and that of the Court of Civil Appeals where not in conflict herewith.