JULIÁN R. RIVERA, demandante y apelado, *v.* FRANCISCO A. CRESCIONI, demandado y apelante.

Número 10725.

*Sometido:* 26 de enero de 1953. *Resuelto:* 4 de agosto de 1954.

*Ángel M. Villamil,* abogado del apelante; *Eduardo Cuchí Coll,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

En el antiguo Tribunal de Distrito de San Juan Julián R. Rivera presentó una demanda "sobre incumplimiento de contrato" contra Francisco A. Crescioni, en que alegaba que el demandante le vendió al demandado mil quinientos cartones o cajas, cada uno de los cuales contenía 24 latas, de jugos del país, "para ser embarcados con destino hacia la ciudad de Nueva York, para los fines de venta, debiendo pagar el demandado al demandante la cantidad de dos dólares y diez centavos ($2.10) por cada cartón .... que habrían de ser satisfechos al demandante al llegar la mercancía a la ciudad de Nueva York y ser levantados por el demandado", que se hicieron dos embarques, el primero de 500 y el segundo de

mil cartones, no habiendo pagado y adeudando Crescioni a Rivera la suma de $3,150 como precio total de venta de esos cartones, adeudando además el demandado al demandante la suma de $77 por concepto de gastos incurridos por el demandante Rivera en el almacenaje y conducción de 577 cartones que el demandado había devuelto a Puerto Rico, "y el seis por ciento (6%) legal, del montante total de las sumas adeudadas, hasta la fecha, deudas que se niega a pagar el demandado, no obstante haber sido requerido para ello varias veces por el demandante." Solicitó el demandante del tribunal que condenase al demandado a pagarle al demandante las sumas ya mencionadas de $3,150, los $77 de almacenaje y conducción, y además el interés legal del seis por ciento del montante total de esas sumas, $500 en concepto de honorarios de abogado y las costas.

El demandado Crescioni contestó la demanda y negó que el demandante le vendiera los cartones, "sino que el mismo demandante, estando en Puerto Rico, embarcó, pagó fletes y consignó a Centaur Trading Company, en Nueva York, la mercancía a que se refiere, y la que venía obligada a pagar la consignataria, entiéndase el demandado, después que la vendiera en Nueva York"; que se trataba de un convenio de consignación; que el demandado le devolvió 600 cartones al demandante y que los otros 900 cartones consignados para la venta en Nueva York, se encuentran almacenados en Nueva York, a la disposición del demandante, estando los jugos en malas condiciones para el consumo humano.

Después de haberse celebrado la vista del caso en sus méritos, el tribunal de San Juan dictó sentencia condenando al demandado a pagar al demandante la suma de $1,580, más las costas y $200 en concepto de honorarios de abogado. Formuló el tribunal las siguientes conclusiones de hechos y de derecho:

"Conclusiones de Hechos

"1. Que el demandante es mayor de 21 años de edad, casado, comerciante y vecino de Santurce, Puerto Rico; y que el de-

mandado es también mayor de 21 años de edad, casado, propietario y con vecindad y residencia en el término municipal de Río Piedras, Puerto Rico.

"2. Que para el día 10 de marzo de 1949, el demandado era dueño y Presidente de la Centaur Trading Co., un negocio de comisiones, con oficinas centrales en la ciudad de Nueva York, Estados Unidos de América; y que el demandante era dueño de la Tropical Fruit Industry, de Puerto Rico, negocio dedicado al enlatamiento de jugos del país con fines de exportación.

"3. Que demandante y demandado acostumbraban hacer negocios entre sí en sus respectivos ramos, vendiéndole a consignación el primero al segundo, latas de jugos de Puerto Rico. El demandante embarcaba con destino a Estados Unidos y consignado al demandado el producto objeto de los negocios.

"4. Que para el 10 de marzo de, 1949, el demandante embarcó con destino a New York, después de pagar los fletes, mil cartones conteniendo cada uno 24 latas de jugo de tamarindo y guanábana, consignados estos cartones a Centaur Trading Company, (demandado), quien venía obligado a pagar al demandante dos dólares diez centavos ($2.10) por cartón después que la mercancía se vendiera en New York.

"5. Que como un mes después el demandante embarcó 500 cartones de·jugo de 24 latas cada uno, con destino a New York y consignados al demandado bajo las mismas condiciones que los primeros mil cartones antes relacionados.

"6. Que de estos mil quinientos (1,500) cartones el demandado le devolvió al demandante 600 cartones de los cuales el demandante dispuso después de levantarlos de uno de los muelles de San Juan.

"7. Que el demandado dispuso en New York de los otros 900 cartones y no los devolvió al demandante, como pudo hacerlo e hizo con los 600 que se deja dicho.

"8. Que dichos 900 cartones de latas de jugo tenían al momento de la transacción un valor de $2.10 cada uno que hacen un total de $1,890.

"9. Que el demandante recibió del demandado a cuenta de los jugos la cantidad de $300.

## "Conclusiones de Derecho

"En virtud de los hechos que el tribunal ha declarado probados, éste entiende que el demandado le adeuda al demandante la suma de $1,590 por concepto de los novecientos (900) cartones contentivos de veinticuatro (24) latas de jugo cada uno,

al precio de dos dólares con diez centavos ($2.10) por cartón, menos trescientos dólares ($300) que el demandado ya recibió. Si bien es cierto que el contrato fué uno de consignación el demandado pudo devolver y devolvió al demandante seiscientos (600) cartones porque éstos estaban dañados, y sin embargo retuvo novecientos (900) cartones de los cuales dispuso a su antojo, y, por lo tanto viene obligado a pagarlos.

"Procede que se dicte sentencia a favor del demandante por la suma de mil quinientos ochenta dólares ($1,580) más las costas de este pleito y la suma de doscientos dólares ($200) para honorarios de abogado."

El demandado ha apelado ante este Tribunal.

En la vista del caso, el demandante declaró, en parte, que él había celebrado un contrato verbal de venta con el demandado en cuanto a los cartones de jugo y que Crescioni le había comprado directamente el jugo a $2.10 el cartón. Sin embargo, el testigo del demandante, Enrique Coll Moya, empleado del demandante, declaró que él estaba presente cuando Rivera y Crescioni hicieron el contrato oral, y que Crescioni le dijo al demandante: "bueno, vamos a hacer un negocio. Voy para Nueva York y si tú me das la representación, te vendo esos jugos allá en Nueva York" y que el negocio se hizo a base de $2.10 el cartón. En su declaración el demandado declaró, en parte, lo siguiente: "A indicación de él, que quería venderlos, acepté que se enviaran a New York para venderlos *y en seguida que se vendieran* pagarlos a razón de $2.10 f.o.b. New York . . . (yo pagaría los jugos) *cuando se vendieran.* . . . . lo que yo vendiera, en diferencia de ese precio ($2.10) era para beneficio nuestro". (Bastardillas nuestras.) Se le preguntó lo siguiente: "Entonces el compromiso que usted hizo fué aceptar siempre y cuando que se los consignara a su firma en Nueva York, y usted, *si lo vendía, pagarle?*", contestando el demandado como testigo: "Garantizarle el pago si se vendía . . . a $2.10 el cartón."

El tribunal de primera instancia no creyó en el testimonio del demandante en cuanto a que el contrato original de ambas partes había sido uno de compraventa y que Crescioni

le había comprado directamente el jugo al demandante. El tribunal a quo creyó más bien en la versión del demandado, como testigo, que ya hemos expuesto, ya que el tribunal formuló la conclusión de hecho que el demandado "venía obligado a pagar al demandante dos dólares diez centavos ($2.10) por cartón después que la mercancía se vendiera en New York." Debemos respetar e imprimirle eficacia a esa conclusión, ya que ella está sostenida por la prueba presentada.

■ Hubo un contrato específico entre las partes en virtud del cual el demandado Crescioni asumió la obligación de pagar $2.10 por cartón de latas de jugo al demandante tan pronto como el demandado vendiese el jugo a una tercera persona. La prueba incontrovertida demostró que el demandado vendió la totalidad de los 1500 cartones a Ángel Víctor Albandoz, antes de que el jugo llegase a Nueva York. Se cumplió, por lo tanto, la condición señalada en el contrato entre el demandante y el demandado para que el demandado fuera obligado a pagar $2.10 por cartón al demandante. Tal obligación del demandado surgió, en forma absoluta, al vender el demandado la totalidad de los 1500 cartones a Albandoz. Tan pronto como se efectuó esa venta a Albandoz, el demandado incurrió en una deuda líquida y absoluta al demandante, por la suma de $3,150 (1500 x $2.10).

■■ El tribunal de San Juan resolvió que se trataba de un contrato de consignación, y que la obligación del demandado surgió del hecho de que el demandado, después de haber devuelto 600 cartones al demandante, no había devuelto los restantes 900 cartones, surgiendo la obligación del demandado de pagar la suma de $1,890 al demandante (900 x $2.10). Ahora bien, la deuda del demandado no se basa en la omisión de devolver los cartones, sino en el cumplimiento de la condición establecida en el contrato entre las partes, en cuanto a la venta del jugo por el demandado a una tercera persona, cuyo cumplimiento dió lugar a la creación de una deuda líquida y absoluta del demandado al demandante, a base de $2.10 por cartón. La apelación se da contra la sentencia, y

no contra sus fundamentos, y fué válida la sentencia, en tanto predicó y midió la responsabilidad del demandado a base de pagar al demandante la suma de $2.10 por cartón.

Desde el punto de vista de la realidad de la existencia de la obligación del demandado de pagar $2.10 por cartón al demandante, es innecesario, en vista de las realidades envueltas en este caso, el determinar específicamente la calificación jurídica que se le debe dar a la transacción entre las partes, esto es, si fué una consignación, un contrato de comisión mercantil o una compraventa mercantil. Se trata sencillamente de un contrato entre las partes en que se cumplió la condición señalada en el contrato como base para que surgiese a la vida legal una deuda líquida del demandado en favor del demandante. Independientemente de como se caracterice la relación contractual entre las partes, lo esencial es que el demandado incurió en una obligación absoluta en favor del demandante, que el demandado ha dejado de cumplir.

En sus conclusiones y en su sentencia el tribunal a quo resolvió que el demandado había devuelto al demandante, y éste había aceptado la devolución de 600 cartones, y que ello implica que el demandante no tiene reclamación alguna contra el demandado con respecto a esos 600 cartones. El demandante no ha apelado ante este tribunal de la sentencia y especialmente de esa parte de la sentencia que le fué desfavorable y, en ausencia de tal impugnación ante nos por el demandante, no podemos considerar si fué o no fué válido el pronunciamiento del tribunal de San Juan al exonerar de responsabilidad al demandado en cuanto a esos 600 cartones. Ello es cierto también en cuanto al dictamen del tribunal a quo en cuanto a que "el demandante recibió del demandado a cuenta de los jugos la cantidad de $300." De todos modos, independientemente de los fundamentos legales aducidos por el tribunal de San Juan, ese tribunal actuó correctamente al imponer la responsabilidad al demandado de pagar al demandante la suma de $2.10 por cartón con respecto a 900 car-

tones (menos los $300 ya mencionados). Tal pronunciamiento debe ser ratificado, por las razones que hemos expuesto en esta opinión.

La tesis desarrollada por el demandado-apelante en su alegato consiste en su alegación de que él no pudo devolver al demandante los restantes 900 cartones debido a la conducta del propio demandante al solicitar que no los devolviese. Pero, como ya hemos visto, la responsabilidad del demandado no se basa en el hecho de que él no devolviese los cartones, sino en el cumplimiento de la condición previa señalada en el contrato.

Ha sido objeto de consideración en el seno de este tribunal la cuestión relativa al derecho del demandante a intereses al seis por ciento sobre la suma adeudada por el demandado, a ser computados desde la fecha en que surgió la obligación líquida del demandado, esto es, desde el momento en que el demandado vendió los cartones a Albandoz. Él reclamó esos intereses en su demanda y, efectivamente, él tenía derecho a reclamar esos intereses como indemnización por la mora en que incurrió Crescioni al no pagar su deuda líquida al demandante. El art. 1061 del Código Civil dispone lo siguiente:

"Si la obligación consistiere en el pago de una cantidad de dinero, y el deudor incurriere en mora, la indemnización de daños y perjuicios, no habiendo pacto en contrario, consistirá en el pago de los intereses convenidos, y a falta de convenio, en el interés legal.

"Mientras que no se fije otro por el gobierno, se considerará como legal el interés de 6 por 100 al año.

Aplicando ese precepto, véanse los casos de *Martínez Fernández y Cía.* v. *García*, 68 D.P.R. 391, 397; *Sucrs. de Pérez Hnos.* v. *Sucrs. de Abarca*, 33 D.P.R. 105, 108; *Ríos* v. *Sastre*, 9 D.P.R. 193 y *Cajigas* v. *Sucn. Prats*, 5 D.P.R. 146. El art. 234 del Código de Comercio determina que "los deudores que demoren el pago de sus deudas después de vencidas, deberán satisfacer desde el día siguiente al del vencimiento el

interés pactado para este caso, o en su defecto el legal." Véase *Cintrón y Aboy* v. *Solá*, 22 D.P.R. 262." Véase además, la Ley núm. 5, aprobada el 17 de agosto de 1933.

El demandado en este caso incurrió en mora al él vender a Albandoz, y, desde ese momento, el demandante tenía derecho a intereses al 6%, como indemnización, o sea, desde la fecha en que el demandado quedó, de hecho, responsable. *Sucrs. de Pérez Hnos.* v. *Sucrs. de Abarca.* Pero el tribunal de primera instancia no incluyó en su sentencia pronunciamiento alguno en cuanto a intereses, no condenó al demandado a pagar intereses al demandante. No obstante tal omisión, el demandante no ha apelado ante este Tribunal de la sentencia dictada por el tribunal a quo, no ha impugnado ante este Tribunal la omisión del tribunal sentenciador de condenar al demandado a pagar intereses. Este Tribunal no puede añadir a la sentencia determinada indemnización en daños y perjuicios si la persona con derecho a tal indemnización no ha apelado ante este Tribunal de la omisión del tribunal de primera instancia de incluir tal indemnización en su sentencia, esto es, si la persona que hubiese de recibir el pago de la indemnización no ha impugnado tal omisión ante este Tribunal. Un tribunal de apelaciones no puede aumentar la cuantía de una sentencia, especialmente en cuanto a indemnizaciones por daños y perjuicios, si la persona en cuyo favor se haya dictado la sentencia no ha apelado la sentencia y no ha presentado cuestión alguna ante este tribunal en cuanto a la cuantía de la sentencia. 1 C.J.S. 1375, sec. 1883, nota 79; *Lee* v. *William Bailey, Corp.* 196 N. E. 9, 11; *Kerens Nat. Bank* v. *Stockton*, 40 S.W. 2d 7.

En el caso de *Padilla* v. *Vidal*, 71 D.P.R. 517, 527, se resuelve que aún si en una sentencia no se mencionan los intereses, tales intereses, por disposición expresa de la ley, forman parte integrante de la sentencia y pueden ser recobrados. En ese caso, los intereses deben ser considerados automáticamente como parte de la sentencia, por mandato de ley. Pero los intereses por mora no están en la misma categoría.

No constituyen parte integrante e inherentemente inseparable de la obligación principal, sino .que son considerados como una indemnización independiente .de daños y perjuicios, impuesta como penalidad por la demora en el pago. Como tal indemnización, que constituye un derecho personal del acreedor, ella puede ser renunciada por el acreedor al él no apelar ante este Tribunal de la omisión de consignarlos en que ha incurrido el tribunal de primera instancia. No se trata de una penalidad adherida automáticamente a la obligación principal por ministerio de ley. Por lo tanto, no procede pronunciamiento alguno en cuanto al pago de intereses.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado Sr. Sifre concurre en el resultado.

---

Opinión disidente emitida por el Juez Asociado Sr. Belaval.

Se trata de una acción de incumplimiento de contrato, en la cual el demandante y apelado señor Julián R. Rivera alegó ante el anterior Tribunal de Distrito de San Juan de Puerto Rico, que entre los meses de marzo y abril de 1949, le había vendido al demandado y apelante señor Francisco A. Crescioni, mil quinientos cartones de latas de jugo, a razón de $2.10 cada cartón, a ser pagados tan pronto la mercadería llegara a la ciudad de Nueva York y fuera levantada por el demandado y apelante; que al requerir el pago de la mercadería levantada, el demandado y apelante se negó a pagarla, alegando entre otros motivos, que algunas de las latas de jugo resultaron en malas condiciones para el consumo humano; asimismo, el comprador señor Crescioni le informó al demandante y apelado, que en uno de los muelles de San Juan había quinientos setenta y siete cartones de latas de jugo, que él había devuelto por estar en malas condiciones para el consumo humano, los cuales ponía a disposición del demandante y apelado, cuyos cartones el demandante y apelado se había visto precisado a recoger del muelle para almacenarlos en su fábrica.

Contestó el demandado y apelante señor Crescioni, negando que el demandante y apelado le hubiera vendido dichos cartones de latas de jugo, y alegando en contrario, *que dicha mercancía le fué consignada al demandado y apelante por el señor Rivera*, por lo cual el demandado y apelante venía obligado a pagar la misma, después que la mercancía fuera vendida en Nueva York; que el demandado y apelante se vió obligado a devolver seiscientos cartones de la mercancía enviada por el demandante y apelado, por estar en malas condiciones para el consumo humano y no haberla podido vender en dicha plaza; que el resto de los cartones de latas de jugo se encontraban todavía en la ciudad de Nueva York, almacenados en poder de varios comerciantes que se habían negado a pagarlos, por estar los jugos en malas condiciones para el consumo humano, pero quienes estarían dispuestos a reembarcarlos para Puerto Rico, si el demandante y apelado estuviera conforme en pagar el almacenaje, acarreto y flete correspondientes.

Visto el caso en el Tribunal de Distrito de San Juan, la ilustrada Sala sentenciadora formuló las siguientes conclusiones de hechos y de derecho:

"1. Que el demandante es mayor de 21 años de edad, casado, comerciante y vecino de Santurce, Puerto Rico; y que el demandado es también mayor de 21 años de edad, casado, propietario y con vecindad y residencia en el término municipal de Río Piedras, Puerto Rico.

"2. Que para el día 10 de marzo de 1949, el demandado era dueño y Presidente de la Centaur Trading Co., un negocio de comisiones, con oficinas centrales en la ciudad de Nueva York, Estados Unidos de América; y que el demandante era dueño de la Tropical Fruit Industry, de Puerto Rico, negocio dedicado al enlatamiento de jugos del país con fines de exportación.

"3. Que demandante y demandado acostumbraban hacer negocios entre sí en sus respectivos ramos, vendiéndole a consignación el primero al segundo, latas de jugos de Puerto Rico. El demandante embarcaba con destino a Estados Unidos y *consignado al demandado* el producto objeto de los negocios.

"4. Que para el 10 de marzo de 1949, el demandante embarcó con destino a New York, después de pagar los fletes, mil cartones conteniendo cada uno 24 latas de jugo de tamarindo y guanábana, *consignados estos cartones* a Centaur Trading Company, (demandado), quien venía obligado a pagar al demandante dos dólares diez centavos ($2.10) por cartón *después que la mercancía se vendiera en New York.*

"5. Que como un mes después el demandante embarcó 500 cartones de jugo de 24 latas cada uno, con destino a New York *y consignados al demandado* bajo las mismas condiciones que los primeros mil cartones antes relacionados.

"6. Que de estos mil quinientos (1,500) cartones el demandado le devolvió al demandante 600 cartones de los cuales el demandante dispuso después de levantarlos de uno de los muelles de San Juan.

"7. Que el demandado dispuso en New York de los otros 900 cartones y no los devolvió al demandante, como pudo hacerlo e hizo con los 600 que se deja dicho.

"8. Que dichos 900 cartones de latas de jugo tenían al momento de la transacción un valor de $2.10 cada uno que hacen un total de $1,890.

"9. Que el demandante recibió del demandado a cuenta de los jugos la cantidad de $300.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"En virtud de los hechos que el tribunal ha declarado probados, éste entiende que el demandado le adeuda al demandante la suma de $1,590 por concepto de los novecientos (900) cartones contentivos de veinticuatro (24) latas de jugo cada uno, al precio de dos dólares con diez centavos ($2.10) por cartón, menos trescientos dólares ($300) que el demandante ya recibió. *Si bien es cierto que el contrato fué uno de consignación* el demandado pudo devolver y devolvió al demandante seiscientos (600) cartones porque éstos estaban dañados, y sin embargo retuvo novecientos (900) cartones de los cuales dispuso a su antojo, y, por lo tanto viene obligado a pagarlos.

"Procede que se dicte sentencia a favor del demandante por la suma de mil quinientos ochenta dólares ($1,580) más las costas de este pleito y la suma de doscientos dólares ($200) para honorarios de abogado."

En apelación, los dos únicos errores levantados por el demandado y apelante son los siguientes: (1) "el tribunal sen-

tenciador cometió manifiesto, inescapable y fatal error de incongruencia de la sentencia con su propia teoría jurídica y con la prueba sometida en el juicio"; (2) "el tribunal sentenciador cometió error en la apreciación de la prueba al declarar que el demandado retuvo a su antojo novecientos cartones de latas de jugo del país, conclusión que no está justificada por la prueba."

En cuanto al primer error, la posición del demandado y apelante parece ser, que tratándose de una mercadería consignada al demandado y apelante como comisionista, dicho demandado y apelante no tenía que responder del valor de la misma en caso de destrucción o menoscabo de la mercadería por vicio propio de la cosa.

Estrictamente considerado, el contrato de consignación no existe en derecho mercantil. La consignación es simplemente una modalidad de la entrega o del depósito de mercadería, dentro del clásico contrato de comisión mercantil especial para fines de venta. Porque esto es así, las relaciones entre el consignante y el consignatario hay que fijarlas de acuerdo con los derechos y obligaciones de la comisión mercantil.

Lo que pretende el demandado y apelante es que se considere la relación jurídica entre él y el demandante y apelado, como un mandato mercantil ordinario, y no como una comisión mercantil, propiamente dicha. Como cuestión de realidad, el mandato mercantil ordinario y la comisión mercantil, son idénticos en el fondo, aunque se diferencian en la manera como interviene el mandatario, pues en el caso del mandato mercantil ordinario, el mandatario interviene a nombre de su mandante por cuenta y riesgo de dicho mandante, menos en casos de dolo o extralimitación del poder concedido, como lo hacen el factor, el mancebo o el dependiente de comercio, mientras en el caso de la comisión mercantil, el comisionista interviene a nombre de su mandante o a su nombre, pero en cualquiera forma que intervenga, queda obligado a cumplir todas las obligaciones provistas para tal caso por el Código de Comercio: III Manual de Derecho Mercantil 88—Lorenzo

Benito—(ed. de Victoriano Suárez de Madrid), (1929). La diferencia esencial en ambas formas del mandato, es más en relación a las obligaciones asumidas ante terceras personas, que en relación a las obligaciones entre mandante y mandatario, o entre comitente y comisionista. Cuando el mandatario actúa en virtud de un mandato mercantil, lo hace a nombre de su mandante y el mandante queda obligado directamente con las terceras personas con las cuales contrata el mandatario, y dichas terceras personas quedan obligadas directamente con el mandante. Cuando el comisionista actúa en virtud de una comisión mercantil, a nombre propio, el comitente no queda obligado directamente con las terceras personas con las cuales contrata el comisionista, ni dichas terceras personas quedan obligadas directamente con el comitente: I-II Comentarios al Código de Comercio 205 et seq— José María González de Echávarri y Vivanco, (ed. de Casa Martín de Valladolid), (1945).

Ahora bien, en este caso no se trata de las relaciones jurídicas del mandante o comitente con terceras personas, sino de las relaciones jurídicas entre mandante y mandatario, o entre comitente y comisionista. Por el resultado de la prueba, tenemos que descartar las posibles relaciones jurídicas entre mandante y mandatario, ya que en este caso, el demandado y apelante actuaba a nombre propio, con mercancía consignada a él por el demandante y apelado.

La necesidad de expandir los negocios más allá de los límites geográficos de la "antigua ciudad", o de la "liga", o de la "nación" donde estuviera situada la casa mercantil principal de los comerciantes, impuso la necesidad de elaborar un mandato mercantil especial, que con el tiempo, había de conocerse en la ciencia del derecho mercantil, como comisión mercantil, para cumplir dos propósitos esenciales: (1) permitirle al mandatario, ahora conocido como comisionista, a contratar a nombre propio, para enfrentarse con la desconfianza natural de los consumidores, que no gustaban de contratar con ninguna persona fuera de la plaza mercan-

til, quedando obligado directamente dicho comisionista con los consumidores de la plaza, y (2) regular las relaciones entre comitentes y comisionistas en una forma más segura para los comitentes, ya que las operaciones de comercio se llevarían a cabo en una plaza distante, donde no sería posible para los comerciantes, ejercer el mismo grado de vigilancia que si dichas operaciones se realizaran por un mandatario dentro de su propia plaza.

Aunque la comisión mercantil es sustancialmente un mandato mercantil, contiene la especialidad de ser un mandato donde el mandatario, llamado comisionista, puede contratar a nombre propio, por resultar más beneficioso para las operaciones mercantiles, que exista una persona directamente responsable a las terceras personas que contraten con dicho comisionista, dentro de otra plaza mercantil distante (*distantia loci*). Pero en las relaciones entre comitente y comisionistas, los comisionistas al igual que los mandatarios, no le responden a sus principales de las obligaciones contraídas ni a nombre del comitente ni a su propio nombre, si han cumplido debidamente con sus obligaciones como tales comisionistas. Puesto en el lenguaje de R. Gay de Montellá, -III- 1ro. Código de Comercio Español 39, (ed. de la Casa Editorial Bosch de Barcelona), (1936) : "La comisión, en las relaciones entre comitente y comisionario, es substancialmente un mandato. Exceptuados los casos de dolo o de culpa en la ejecución del mandato, el comisionista no asume ninguna responsabilidad enfrente del comitente, respecto de las obligaciones contraídas por las personas con las cuales ha contratado, ni el comitente puede pedir al comisionista el cumplimiento de tales obligaciones, ni menos el resarcimiento de los daños o perjuicios derivados de la insolvencia de los terceros." Por una razón parecida, tampoco respondería del incumplimiento de los contratos por las terceras personas, en caso de vicio propio de la cosa.

Pero por la misma razón, que la comisión mercantil es un mandato especial para ser cumplido en una plaza mercantil

distante, los estatutos mercantiles contienen una prolija enumeración de obligaciones y una extensa imposición de responsabilidades que debe cumplir el comisionista, para en esta forma, garantizarle al comitente los riesgos previstos en una operación mercantil que se realiza a una distancia que hace casi imposible su fiscalización personal de las operaciones de comercio realizadas por sus comisionistas.

Las responsabilidades del comisionista por la mercadería consignada, de acuerdo con el Código de Comercio de Puerto Rico, son las siguientes:

1. responder de los efectos y mercaderías que recibiere, (art. 183) ;

2. responder de su conservación en el estado que los recibió, (art. 184) ;

3. vender, previa autorización de la autoridad competente, aquellos efectos que deben ser rematados por alguna alteración en la condición de los mismos, para salvar la parte posible de su valor, (art. 187) ;

4. no vender al fiado o a plazos, sin autorización del comitente, (art. 188) ;

5. cobrar los créditos de su comitente en las épocas en que fueren exigibles, (art. 191) ;

6. asegurar los efectos consignados si así lo hubiere ordenado el comitente, (art. 192) ;

7. no concertar una operación a precios o condiciones más onerosas, que las corrientes en la plaza a la fecha en que se hizo, (art. 176) ;

8. observar lo establecido en las leyes y reglamentos respecto a la negociación que 'se le hubiere confiado, (art. 177) ;

9. no hacer delegación o sustitución de los encargos que reciba, sin autorización de su comitente, (art. 179) ;

10. no darle una inversión o destino distinto a los fondos anticipados para evacuar un encargo, (art. 182) ;

11. no alterar las marcas de los efectos que hubiere vendido por cuenta ajena, ni tener efectos de una misma especie

pertenecientes a distintos dueños bajo una misma marca, (arts. 185 y 186);

12. *no comprar para sí ni para otro*, lo que se le haya mandado vender, sin licencia del comitente, (art. 185).

Estas son "las obligaciones del buen comerciante" que establece nuestro Código de Comercio, que debe cumplir el comisionista en favor de su comitente. De la misma forma que "no se concebiría cómo el mandatario pueda asumir la obligación para hacer una cosa en su propio interés,"—R. Gay de Montellá, obra citada, pág. 15—, no se puede concebir una comisión mercantil donde el comisionista compre para sí o para otro lo que se le haya mandado vender. "Si el comisionista comprase para sí o para otro lo que se le haya mandado vender, (o) vendiere lo que se le haya mandado comprar, sin licencia del comitente, el comisionista no obra como tal enfrente del comitente, *sino como un comprador o un vendedor cualquiera"*: R. Gay de Montellá, obra citada, pág. 36.

Los dos únicos casos en que los comisionistas le responderían a sus comitentes de las operaciones realizados por éstos, serán: (1) cuando el comisionista percibiere sobre una venta, además de la comisión ordinaria, otra llamada de garantía, ("seguro del buen dinero") en cuyo caso correrían por cuenta de los comisionistas los riegos de la cobranza, estando obligados dichos comisionistas a satisfacer al comitente el producto de la venta en los mismos plazos pactados por el comprador, (art. 190); (2) cuando el comisionista vende al fiado y a plazos sin autorización del comitente, en cuyo caso, el comitente puede exigirle el pago de contado, dejando a favor del comisionista cualquier interés, beneficio o ventaja que resulte de dicho crédito a plazo, (art. 188). El resto de las responsabilidades del comisionista son aquéllas que provienen de la *culpa* o del *dolo*, por haber dejado incumplïda en alguna parte, la comisión mercantil, o por haber actuado en contra de los mejores intereses de su comitente.

Como se trata de una acción por culpa o dolo por el incumplimiento de la comisión mercantil, el comitente a lo que tiene

derecho, es al resarcimiento de los daños y perjuicios, inde-
pendientemente en algunos casos, del valor monetario de la
operación mercantil. Los arts. 166, 170, 174, 176, 182, 185,
191, 192 de nuestro Código de Comercio de lo que hablan es
del resarcimiento de los daños y perjuicios. Entre las res-
ponsabilidades de la culpa por el incumplimiento de la co-
misión, está la de conservación o remate oportuno de la mer-
cadería consignada. Según comenta el ilustrado profesor
don José María González de Echávarri y Vivanco, en su obra
anteriormente citada, a la pág. 212, "en cuanto a la mer-
cancía, nacen obligaciones del comisionista *desde el momento
que se le consigna*, defendiendo los derechos del comitente en
frente de porteadores y capitanes; no menor es su deber
relacionado con la conservación y custodia de la mercancía,
ya que debe aplicar la diligencia del buen comerciante para
evitar su pérdida y daño . . . Es obligación suya también
no aprovecharse en su favor de las ventajas que pueda pro-
porcionar al comitente el encargo recibido pues todas ellas
como *causa lucri* deben rendir beneficio al comitente."

La teoría del demandado y apelante es, que tratándose
como posiblemente se trata, de una consignación de merca-
dería, dentro de una posible comisión mercantil especial para
venta, él no le es responsable, al demandante y apelado por
las operaciones realizadas con terceras personas, las cuales se
han negado a satisfacer el precio de la mercadería, por estar
dicha mercadería dañada. Estamos conformes que esa sería
la verdadera situación jurídica, si el demandado y apelante,
a su vez nos convenciera, que en este caso, él cumplió debida-
mente con sus obligaciones de comisionista, dentro de la co-
misión mercantil.

Pero la prueba en este caso, en cuanto a la disposición de
la mercadería averiada, no deja lugar a duda sobre la respon-
sabilidad del comisionista por el incumplimiento de la comi-
sión mercantil, si partimos del supuesto que la verdadera re-
lación jurídica entre el demandante y apelado y el deman-
dado y apelante era una de comisión mercantil especial para

fines de venta.  De los mil quinientos cartones embarcados para Nueva York, fueron reembarcados para Puerto Rico seiscientos cartones, que levanta del muelle de San Juan el demandante y apelado.  De los novecientos cartones restantes, hay ciento noventa y seis que fueron vendidos y cobrados a sus detallistas por el señor Albandoz y pagados por éste último al demandado y apelante.  En cuanto a los setecientos cuatro cartones restantes, no deja de ser curiosa la forma en que se dispone de ellos, no obstante haberse recibido sin objeción legal en tiempo oportuno.  Dice el señor Albandoz que algunos detallistas le devolvieron algunos cartones, pero que otros están todavía en poder de los detallistas.  De los cartones que le devolvieron al señor Albandoz, algunos se encuentran en el sótano de un establecimiento del señor Albandoz en Nueva York, y otros los destruyó el propio señor Albandoz, en presencia de los peones de la basura, mediante una especie de decomisación privada, sin recurrir a ninguna autoridad judicial o administrativa que los hubiera podido decomisar legalmente por constituir una posible amenaza para la salud pública.  De la prueba presentada no se puede precisar cuántos de los cartones, todavía en poder del señor Albandoz y de sus detallistas de Nueva York, se encuentran en tal estado de deterioro o avería que no puedan ser vendidas en el mercado.  De acuerdo con el art. 184 del Código de Comercio de Puerto Rico, es al comisionista a quien corresponde acreditar, en forma legal, el menoscabo de la mercadería.  El peso de la prueba es suyo, tan pronto se establece el hecho de la entrega.

Si se trataba de una consignación dentro de un contrato de comisión mercantil, según pretende el demandado y apelante, de acuerdo con los arts. 183 y 184 del Código de Comercio de Puerto Rico, relacionados con el art. 187 del mismo código, era deber del comisionista conservar la mercadería consignada en el mismo estado que la había recibido.  Si por el transcurso del tiempo, o por vicio propio de la cosa, "ocurriere en los efectos encargados a un comisionista, alguna

alteración que hiciere urgente su venta para salvar la parte posible de su valor, y fuere tal la premura que no hubiere tiempo para dar aviso al comitente, y aguardar sus órdenes, acudirá el comisionista al Juez o Tribunal Competente, que autorizará la venta con las solemnidades y precauciones que estime más beneficiosas para el comitente": Gay de Montellá, obra citada, págs. 33 y 36; I Curso de Derecho Mercantil 266, Pablo González Huebra, (ed. de la Librería Sánchez de Madrid), (1867). Si la mercadería estaba a tal punto dañada que representaba una amenaza para la salud pública, era deber del comisionista avisar a las autoridades sanitarias del estado para que éstas procedieran a decomisar dicha mercancía.

Pero el error señalado ante nos es, que "el tribunal sentenciador cometió manifiesto, inescapable y fatal error de incongruencia de la sentencia con su propia teoría jurídica y con la prueba sometida en el juicio." Tal parece que lo que afirma el demandado y apelante es, que la conclusión de derecho de la ilustrada Sala sentenciadora en el sentido que el contrato fué uno de consignación, está en conflicto con la conclusión de hecho de la misma sala en el sentido que el demandado y apelante venía obligado a pagar al demandante y apelado dos dólares diez centavos por cartón después que la mercadería se vendiera en Nueva York. El contrato de consignación aparece, en primer término, como una conclusión de hecho en el hecho 4, que extractado en sus contenidos pertinentes, dice: el demandante embarcó para Nueva York mil cartones de jugos *consignados* al demandado, quien venía obligado a pagar al demandante dos dólares diez centavos por cartón *después que la mercadería se vendiera en Nueva York.* El contrato de consignación aparece, en segundo término, como una conclusión de derecho, en aquella parte de las conclusiones de derecho que dice: "Si bien es cierto que el contrato fué uno de consignación el demandado pudo devolver y devolvió al demandante seiscientos (600) cartones porque éstos estaban dañados, y sin embargo retuvo

novecientos (900) cartones de los cuales dispuso a su antojo, y por lo tanto, viene obligado a pagarlos." Debemos disponer en primer término de la conclusión de hecho y ver qué demuestra la transcripción de la evidencia.

Entiendo que ha llegado el momento de precisar, con un afán más científico y moderno, el verdadero alcance que en la Regla 52 (a) de las Reglas de Enjuiciamiento Civil para las Cortes de Puerto Rico, tiene la disposición que "las conclusiones de hecho basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas y se tomará en cuenta la oportunidad de la corte sentenciadora para juzgar de la credibilidad de los testigos." Como siempre que se pretende esclarecer cualquier problema de derecho, debemos empezar por fijar la teoría bajo la cual se ha mantenido la institución de derecho correspondiente.

La imposibilidad de reproducir ante los tribunales de apelación o de revisión, los elementos puramente expresionales de los testimonios orales, le impuso a dichos tribunales de apelación, o revisión, la obligación de respetar la apreciación que el juez sentenciador hiciera, de aquellos elementos de la credibilidad que se desprenden espontáneamente de la conducta del testigo, mientras presta declaración ante un juez de hechos.

No es este el momento de malograr la crítica de ese pequeño muestrario de los indicios expresionales, que se supone formen parte de la sagacidad de un juez de hechos. Con los conocimientos que tenemos hoy de psicología aplicada, sabemos que es altamente improbable estudiar a través de una observación tan rápida, en circunstancias tan poco deseables como la que brinda un juicio sobre los hechos, la conducta moral de un testigo. Sálvese por algún tiempo el ingenuo muestrario de los indicios expresionales coleccionado por la experiencia de cada juez de hechos, para buscar la verdad a través de esa curiosa revelación plástica de la credibilidad que se supone pueda reflejarse sobre la figura humana. Confieso que mi experiencia de diez años como juez de hechos, lo

que me produjo fué una duda profunda sobre la eficacia del método. Para una crítica de la evidencia de conducta (*demeanor evidence*) véase el caso de *National Labor Relations Board* v. *Dinion Coil Co.*, 201 F.2d 484, (*Frank*), (1952), cita precisa a las págs. 487-490.

Por un largo tiempo, siguiendo la práctica del jurado civil o la práctica de la equidad, fué una regla bastante aceptable para los tribunales de apelación o de revisión, que si en la transcripción escrita de los testimonios orales, había alguna comprobación factual, (*sufficient evidence*), de la conclusión de hecho del juez sentenciador, los tribunales de apelación o de revisión no intervenían con dicha conclusión de hecho. Basta reflexionar un momento para darnos cuenta de lo absurdo que podría resultar en la práctica judicial, sobreponer la percepción rudimentaria de los elementos expresionales de la credibilidad a la concepción razonada de los elementos lógicos de la credibilidad.

La inclusión en la Regla 52(a) de las Reglas Federales de Procedimiento Civil, de la nueva disposición, que las conclusiones de hecho basadas en testimonio oral se dejarían sin efecto si resultaban claramente erróneas, (*clearly erroneous*), le dió una oportunidad a los tribunales progresistas de formular una nueva regla de práctica judicial, en el sentido, que la conclusión de hecho del juez sentenciador no prevalecería, aunque hubiera alguna evidencia que la sostuviera, (*sufficient evidence*), *si dicha conclusión de hecho no representaba el balance más racional, justiciero y jurídico de la totalidad de la evidencia.* Puesto en las palabras del ilustrado Juez Stanley Reed de la Corte Suprema de Estados Unidos: "una conclusión de hecho puede resultar 'claramente errónea', aunque haya evidencia que la sostenga, *si del examen de la totalidad de la evidencia* el tribunal de revisión queda definitiva y firmemente convencido que un error ha sido cometido": *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 92 L. Ed. 746, (*Reed*), (1948), cita precisa a la pág. 395 U. S. o a la pág. 766 L. Ed. Con-

traria a la suposición, que lo interpretado por la Corte Su-
prema de Estados Unidos, obedecía a un caso excepcional
que en nada intervenía con la vieja práctica de la conclusi-
vidad, se ha convertido en una regla uniforme, para todos
aquellos casos donde las conclusiones de hecho del juez sen-
tenciador, estén en conflicto con el balance más racional, jus-
ticiero y jurídico de la totalidad de la evidencia recibida,
(*the weight of the evidence*) : *Arnolt Corp.* v. *Stansen Corp.*,
189 F.2d 5, (*Finnegan*), (1951), cita precisa a la pág. 9;
*Smith* v. *Manning*, 189 F.2d, 345, (*Kalodner*), (1951), cita
precisa a la pág. 349; *Gindorff* v. *Prince*, 189 F.2d 897,
(*Clark*), (1951), cita precisa a la pág. 898; *Pennsylvania
Threshermann & Farmers Mut. Cas. Ins. Co.*, v. *Crapet*, 199
F.2d 850, (*Rives*), (1952), cita precisa a la pág. 853; *Sturm*
v. *Washington Nat. Ins. Co.*, 208 F.2d 97, (*Gardner*), (Nov.
1953), cita precisa a la pág. 102; *Salaky* v. *The Atlas Barge
No. 3*, 208 F.2d 174, (*Clark*), (Nov. 1953), cita precisa a
la pág. 175; *Home Indemnity Co. of New York* v. *Standard
Acc. Ins. Co.*, 167 F.2d 919, (*Garrecht*), (1948), cita precisa
a la pág. 923; *State Farm Mut. Automobile Ins. Co.* v.
*Bonacci*, 111 F.2d 412 (*Gardner*), (1940), cita precisa a la
pág. 415.

Cuando la evidencia consista no sólo de testimonios orales,
sino también de documentos públicos o privados, de deposi-
ciones judiciales de testigos ausentes, de estipulaciones es-
critas u orales de hechos aceptados, o de hechos incontrover-
tidos por las alegaciones o la prueba, la regla de la conclu-
sividad se aplica exclusivamente a los testimonios orales ver-
tidos en presencia del juez de hechos, pero no se aplica al
resto de la evidencia, por entenderse que los tribunales de
apelación o de revisión, están en igual situación que la sala
sentenciadora, para formar juicio sobre el resto de la evi-
dencia.   Con esto, la regla de la conclusividad quedó restrin-
gida exclusivamente, a aquella parte de la evidencia oral de
la cual se desprenda un conflicto irreconciliable, aunque ra-
cionalmente probable, entre dos versiones contradictorias so-

bre un hecho esencial, que no pueda ser esclarecido por ninguna otra parte de la evidencia, o que para su esclarecimiento, necesite de aquellos elementos expresionales de la credibilidad que brinda a la convicción del juzgador, la observación del testigo mientras presta su declaración: *Wigginton v. Orders of United Commercial Travelers*, 126 F.2d 659 (*Minton*), (1942), cita precisa a la pág. 661, (hechos estipulados); *Johnson v. Griffiths S. S. Co.*, 150 F. 2d 224, (*Garrecht*), (1945), cita precisa a la pág. 225, (deposiciones), *Kuhn v. Princess Lida of Thurn & Taxis*, 119 F.2d 704, (*Jones*), (1941), cita precisa a la pág. 706 (hechos no controvertidos); *Carter Oil Co. v. McQuigg*, 112 F.2d 275 (*Evans*), 1940; cita precisa a la pág. 279 (documentos); *Equitable Life Assur. Soc. v. Irelan*, 123 F.2d 462, (*Healy*), (1941), cita precisa a la pág. 464 (deposiciones); *Fleming v. Palmer*, 123 F.2d 749, (*Mahoney*), (1941), cita precisa a la pág. 751 (documentos). Claro es, que en aquellos casos donde la supremacía de la evidencia oral es manifiesta, y el conflicto entre los testimonios irreconciliables ha sido resuelto por el juez, aceptando la versión de una de las partes, la regla de conclusividad se aplica sin reserva de clase alguna, a menos que no resulte contraria al orden natural de las cosas o al orden racional de la inteligencia humana. Véase, como ejemplo, *Gindorff v. Prince*, supra, cita precisa a la pág. 898; en cuanto al alcance conjetural de la conclusión de hecho, véase *Hunter v. Dowd*, 198 F.2d 13, (*Lindley*), (1952), cita precisa a la pág. 17; en cuanto a la correcta actitud judicial frente a una jurisprudencia de la improbabilidad, véase *Old Colony Bondholders v. New York N.H.S.H.R. Co.*, 161 F.2d 413, (*Frank*, disidente), (1947), cita precisa a la pág. 443.

La imposibilidad teórica de separar totalmente las cuestiones de hecho y de derecho, en aquellas conclusiones que resulten conclusiones mixtas de hecho y de derecho, ha creado a su vez, la necesidad de distinguir entre las inferencias puramente testimoniales (*testimonial inferences*) y las inferen-

cias secundarias o derivadas de las inferencias puramente testimonales. Si el hecho probado es suficiente para inferir de él otro hecho, el tribunal de apelación o de revisión debe respetarlo. Pero si del hecho probado, o del hecho inferido directamente del hecho probado, el juez sentenciador deduce o infiere otras conclusiones de hecho o de·derecho, que ya no tienen carácter factual propiamente dicho, sino carácter jurídico, esta segunda inferencia derivada de la apreciación de los hechos, se considera una conclusión de derecho, la cual siempre está sujeta a examen y revocación por el tribunal de apelación o de revisión: *Kuhn* v. *Princess Lida of Thurn & Taxis*, supra (*Jones*), (1941), cita precisa a las págs. 705 y 706; *E. F. Drew & Co.* v. *Reinhard*, 170 F.2d 679, (*Learned Hand*), (1948), cita precisa a las págs. 683 y 684; *American Tobacco Co.* v. *The Katingo Hadjipatera*, 194 F.2d 449 (*Frank*), (1951), cita precisa a la pág. 451; *Ball* v. *Paramount Pictures*, 169 F.2d 317, (*McLaughlin*), (1948), cita precisa a la pág. 318, *Orvis* v. *Higgins*, 180 F. 2d 537 (*Frank*), (1950), cita precisa a las págs. 538, 539, 540;

Resumiendo: las conclusiones de hecho del juez sentenciador serán mantenidas, cuando después de examinada la totalidad de la evidencia, representen el balance más racional, justiciero y jurídico de la misma y no contravengan el orden natural de las cosas ni el orden racional de la inteligencia humana. Cualquiera deducción o inferencia de un hecho probado, que no represente una deducción o inferencia de tal hecho, sino que represente la aplicación de un principio de ley, de un razonamiento lógico o de una opinión jurídica al hecho probado, o al hecho deducido o inferido del hecho probado, se considerará una conclusión de derecho, abierta al examen y repudiación del tribunal de apelación o de revisión.

Examinada en su totalidad la transcripción de la evidencia, para nosotros es claro, que la conclusión de hecho o de derecho, o la conclusión mixta de hecho y de derecho, que el contrato celebrado entre el demandante y apelado y el deman-

dado y apelante fué uno de consignación, aunque existe alguna prueba en la transcripción de la evidencia que la sostiene, no representa el balance más racional, justiciero y jurídico de la totalidad de la prueba. Examinadas de nuevo tanto la conclusión de hecho número 4 como la conclusión de derecho de la ilustrada Sala sentenciadora, tampoco estamos seguros que haya sido el criterio del juez sentenciador que la relación jurídica existente entre el demandante y apelado y el demandado y apelante fuera una de comisión mercantil especial para fines de venta, donde la mercadería consignada quedaba por cuenta del comitente para futuras operaciones. En primer lugar, lo que se pactó entre las partes fué un precio por unidad y no una comisión, signo este último, característico de la comisión mercantil. En segundo lugar, la disposición de la mercadería no quedó sujeta a instrucciones del comitente, quedando el demandado y apelante en condiciones de disponer de ella libremente, para su propio beneficio, (causa lucri). En tercer lugar, hay un hecho incontrovertido (*undisputed fact*), que participa de la naturaleza de una admisión, que se desprende espontáneamente de la prueba y que constituye la clave de la verdadera relación jurídica entre las partes: antes de salir los cartones de latas de jugo de Puerto Rico para Nueva York, la partida entera de mil quinientos cartones le había sido vendida por el señor Crescioni a un comerciante puertorriqueño de Nueva York, el señor Ángel Víctor Albandoz, y éste último a su vez, por lo menos en cuanto al primer embarque de mil cartones, la había colocado entre ciertos detallistas de la ciudad de Nueva York. Como cuestión de hecho quien recibe la mercadería en el muelle de Nueva York es el señor Albandoz y no el señor Crescioni, aquí demandado y apelante. No hay duda que el señor Crescioni le vende directamente a su nombre al señor Albandoz y no a nombre del comitente, por lo cual tenemos que descartar la posibilidad del mandato mercantil, o de la modalidad de la comisión mercantil mediante la cual el comitente queda obligado directamente con las personas con

quienes ha contratado el comisionista. No hay duda que el precio de reventa para su propio beneficio, lo fija el señor Crescioni y no el comitente al señor Albandoz, por lo cual tenemos que descartar la posibilidad de una comisión mercantil donde es norma inflexible, que el comisionista no puede vender para su propio beneficio, ni para beneficio de cualquiera otra persona que no sea el comitente, la mercadería objeto de la comisión. Dándole entero crédito a la versión del demandado y apelante sobre la clase de contrato celebrado, que resulta ser la misma creída por la ilustrada Sala sentenciadora, "pagarlo cuando se vendiera" (t45) tenemos que llegar a la conclusión, que tan pronto la mercadería se levanta del muelle de Nueva York por el señor Albandoz, lo que ha quedado consumado entre el demandante y apelado señor Julián R. Rivera y el demandado y apelante señor Francisco A. Crescioni, es una compraventa mercantil, ya que, en cualquiera operación mercantil entre comerciantes donde aparezcan las dos características de "reventa" y "lucro" estamos ante un caso de compraventa mercantil. Por lo menos, estaríamos ante el caso, donde una comisión mercantil especial para fines de venta, puede transformarse en una compraventa mercantil entre comitente y comisionista, de acuerdo con el art. 188 del Código de Comercio de Puerto Rico.

El contenido intrínseco del negocio jurídico debe prevalecer siempre sobre los aspectos formales de los contratos. La acotación que de la sentencia número 5 de 19 de marzo de 1923 de la Audiencia de la Habana, hace el ilustrado doctor en derecho civil y público don Eduardo Rafael Núñez y Núñez—II Código de Comercio 374, (ed. de la Cultural S. A. de la Habana), (1939)—establece, que "según constante jurisprudencia no es de tenerse en cuenta la calificación legal que arbitrariamente le den los interesados a un contrato, sino que cualquiera que sea el nombre con que lo designen, el contrato debe ser calificado, de acuerdo con los preceptos legales aplicables, teniendo en cuenta su naturaleza y en

cada caso las cláusulas y estipulaciones que contenga revela-
dores de la intención de los contratantes" . . . .

En cuanto a la disposición de la mercadería dañada por
vicio propio de la cosa, dentro de un contrato de compraventa
mercantil, de acuerdo con el art. 254 del Código de Comercio
de Puerto Rico, relacionado con el art. 1247 del Código Civil
de Puerto Rico, era deber del comprador devolver la cosa
averiada o deteriorada, antes de dar por rescindido el con-
trato: 1 Curso de Derecho Mercantil 249—Pablo González
Huebra, (Ed. de la Librería Sánchez), (1867). Estamos
conformes con la ilustrada Sala sentenciadora que cualquier
que fuera el contrato envuelto, el demandado y apelante
no tenía derecho a disponer de la mercadería averiada en nin-
guna forma que resultara lesiva al demandante y apelado,
sin una previa confiscación administrativa o una previa de-
claración judicial.

Por la misma razón el demandante y apelado, para recu-
perar del comprador el pago de los seiscientos cartones de-
vueltos por el comprador, hubiera tenido que depositar judi-
cialmente la mercadería devuelta, para que la autoridad ju-
dicial determinara si dicha devolución resultaba injustifi-
cada, de acuerdo con el art. 250 del Código de Comercio de
Puerto Rico relacionado con el art. 257 del mismo Código:
III 1ro. Código de Comercio Español 188–190—Gay de Mon-
tellá (ed. citada); II Manual de Derecho Mercantil 313 et
seq. Lorenzo Benito, (ed. de Victoriano Suárez de Madrid)
(1929); IV Comentarios a la Ley de Enjuiciamiento Civil
Reformada 526—José María Manresa y Navarro (ed. de la
Imprenta de la Revista de Legislación), (1895).

Me he visto obligado a concluir que tan pronto se entrega
la mercadería en el muelle de Nueva York, lo que queda con-
sumada entre las partes es una verdadera compraventa mer-
cantil, por nuestra obligación de aplicar el art. 259 del Có-
digo de Comercio de Puerto Rico que establece que: "la de-
mora en el pago del precio de la cosa comprada constituirá
al comprador en la obligación de pagar el interés legal de

la cantidad que adeude al vendedor", desde que las mercaderías fueran puestas a disposición del comprador, o aquéllas fueran judicialmente depositadas, si el comprador se negare a recibirlas." De acuerdo con el sabio comentarista español don José María González de Echávarri y Vivanco, III Comentarios al Código de Comercio y Jurisprudencia Española 456, (ed. de la Imprenta y Librería de Casa Martín), (1945): "la justificación de este precepto está en los títulos de lucro cesante y daño emergente, a los cuales queda reducido el retardo o mora, pues el vendedor a quien el comprador no satisface al precio, pierde el uso precioso y contratable del dinero en que aquél consiste." Como cuestión de hecho, aunque se tratara de una comisión mercantil, en caso de morosidad al reintegrar al comitente el sobrante de las cantidades, después de deducida su comisión, tendría que abonar igual interés, art. 181 del Código de Comercio de Puerto Rico. Para ello no debe servirnos de obstáculo el hecho que en el señalamiento de errores, no se haya consignado como error o no se haya apelado específicamente el punto envuelto.

En cuanto a no haberse señalado específicamente como error la no inclusión de los intereses, la sec. 1 de la Ley para Transformar la Corte Suprema de Puerto Rico en una Corte de Apelación, aprobada el 12 de marzo de 1903—Código de Enjuiciamiento Civil de Puerto Rico, pág. 292, (ed. del Negociado de Materiales, Imprenta y Transporte), (1933), que dispone: "que el Tribunal Supremo de Puerto Rico constituirá de aquí en adelante un Tribunal de Apelaciones y no un Tribunal de Casación; en sus deliberaciones y fallos, en todos los asuntos, *tanto en lo civil como en lo criminal*, dicho tribunal *no se limitará solamente* a infracciones de ley o quebrantamientos de forma, *según fueren señalados*, alegados o salvados por los litigantes, o según se hiciere constar en sus exposiciones y excepciones, sino que *con el más alto fin de justicia, el tribunal puede también entender en todos los hechos y tramitaciones en la causa, tal como aparecieren en autos,* considerando en igual forma sus méritos para

la mejor administración de justicia y del derecho y *evitar injusticias y demoras*," nos concede autoridad suficiente para entender en cualquier error cometido por un juez sentenciador, que se desprenda de los autos de la causa, aunque dicho error no haya sido señalado por ninguna de las partes: *Penne González y de la Guerra, Opositor,* 46 D.P.R. 264, (*Del Toro*), (1934), cita precisa a la pág. 266; *Rivera* v. *Sucn. Lugo,* 42 D.P.R. 189, (*Texidor*), (1931), cita precisa a la pág. 193; *National City Bank* v. *Llonín,* 41 D.P.R. 163, (*Texidor*), (1930), cita precisa a la pág. 171; 2 Cal. Jur. 729, sec. 420 (ed. de Bancroft Whitney Company de San Francisco), (1921); 4 Cal.Jur. (2d) 317, sec. 483 (ed. de Bancroft Whitney de San Francisco), (1952).

En cuanto a no haberse apelado específicamente el punto envuelto, cuando el error consista de una indebida aplicación de la ley, los tribunales de apelación o de revisión tienen poder para corregir por sí mismos errores en la aplicación de la ley: *Castro* v. *Payco, Inc.,* 75 D.P.R. 63, (*Marrero*), (1953); cita precisa a la pág. 75; *Rodríguez* v. *Martínez,* 68 D.P.R. 450 (*De Jesús*), (1948), cita precisa a la pág. 456; *Concepción* v. *Latoni,* 63 D.P.R. 693, (*Travieso*), (1944), cita precisa a la pág. 696.

Disiento.