EL PUEBLO DE PUERTO RICO, demandante y apelado *v*. ARCA-
DIO TÚA CINTRÓN, acusado y apelante.

*Número:* 16451. *Resuelto:* 27 de noviembre de 1961.

42

*José Rafael Gelpí, Celedonio Medina Lozada* y *Benjamín Ortiz,* abogados del apelante; *J. B. Fernández Badillo, Secretario de Justicia, Arturo Estrella, Secretario Auxiliar de Justicia, Alfredo Archilla Guenard, Fiscal Tribunal Supremo, William Fred Santiago, Fiscal Auxiliar Tribunal Supremo,* abogados de El Pueblo, apelado.

Sala integrada por el Juez Asociado Señor Belaval, como Presidente de Sala, y los Jueces Asociados Señores Santana Becerra y Blanco Lugo.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

El apelante nos señala 15 errores contra la sentencia de asesinato en primer grado que se le dictó en este caso. Para entrar en la discusión de los mismos daremos a conocer la prueba que aparece en el récord sobre los hechos esenciales en torno a esta muerte.

El primer testigo de El Pueblo declaró que el 28 de julio de 1956,—el mismo día de los hechos,— el apelante fue a su farmacia entre cuatro y cinco de la tarde a comprar algo para los nervios y él le vendió 20 tabletas de bromural en un sobrecito de la farmacia que procedió a identificar. El apelante se tomó una tableta en la propia farmacia. Le dijo al testigo que estaba nervioso, que había perdido la noche en el velorio del Lcdo. Nelson Colberg.

Luis Marty Rivera declaró que estando en un mitin político el domingo anterior al día de la muerte,—sábado 28 de julio de 1956,—la víctima Loreto Rivera le dijo al apelante Túa que él era un pillo y le había robado terreno porque le había rodado las cercas de sus colindancias. Iba a haber un encuentro entre ambos que fue evitado. El viernes día anterior a los hechos Túa pidió al declarante que le sir-

viera de testigo para demandar a Loreto Rivera por la imputación de pillo a lo que el testigo se negó. Túa entonces le dijo: "Si tú no me sirves de testigo, lo mato como un perro", refiriéndose a la víctima. El testigo informó eso a Rivera y éste dijo que ese no mataba ni a una gallina.

Casto Ramírez declaró que como a las ocho de la noche del 28 de julio de 1956 vio venir a la víctima quien se paró un rato frente a una vitrina del establecimiento de A. Sanabria a ver la mercancía, y desde el balcón de su casa a unos 35 a 40 pies oyó 5 ó 6 tiros corridos y vio una persona de pie que no pudo apreciar disparando hacia el suelo, vio los fogonazos hacia abajo. No vio nada en el suelo debido a la oscuridad y la distancia y vio al hombre pero no podía decir quién era. El foco estaba fundido y sólo veía la figura del hombre de pie que disparaba hacia abajo. Dijo no haber oído palabras o provocaciones antes de los disparos.

Miguel Angel Camacho declaró que como a las ocho de la noche del 28 de julio la víctima Loreto Rivera venía por el frente de A. Sanabria y vio a Túa a la parte de atrás del establecimiento. Cuando Rivera venía doblando la esquina Túa estaba detrás de un dron de basura situado en la acera "ñangotado" detrás del dron, de unos 3 pies de altura, y salió de detrás del dron y le disparó el primer tiro, como a ocho pies de distancia. La víctima cayó al suelo con este disparo. Túa hizo cinco disparos más estando Rivera en el suelo, como a tres o cuatro pies de distancia. Al primer tiro la víctima cayó. El sitio estaba oscuro. En la repregunta este testigo dijo que estaba "ajumao", había estado bebiendo cerveza, luego dijo que estaba "vacilón". La primera vez que pasó vio al apelante de pie, la segunda vez cuando dio la vuelta a la tienda lo vio detrás del dron. Dijo que la víctima llevaba una botella de cerveza chiquita en la mano derecha. Este testigo montaba una bicicleta por el sitio de los hechos.

Apolonio Irizarry manifestó que esa noche como de ocho y cuarto a ocho y media al llegar a la calle de A. Sanabria a la parte de atrás divisó a Túa y a Loreto Rivera y cuando se les fue acercando salió un disparo y rápidamente otro corrido. Rivera cayó al suelo. Túa estaba al lado de un dron y Rivera estaba de frente, ambos frente a frente y el dron por el medio. Oyó solo dos disparos y Túa corrió cuando cayó la víctima. Este testigo también iba en una bicicleta. El primer disparo fue como a ocho pies y el segundo a seis. El sitio estaba bastante oscuro.

El Teniente de la Policía Marcos A. Vega dijo que al llegar al sitio de los hechos registró el cadáver de Loreto Rivera y le encontró dinero y documentos. Halló una botella de cerveza India hacia la cabeza de la víctima y un plomo incrustado en la pared de A. Sanabria. En la mañana del 30 de julio encontró en el patio de una casa situada detrás de A. Sanabria un revólver calibre 38 con seis cápsulas disparadas, que aparecía estar inscrito a nombre del apelante desde el año 1948.

En adición a los hechos anteriormente expuestos, hubo prueba médica sobre la autopsia. También, que ocho días antes de la muerte la víctima había mandado a decir al apelante que por la orilla de tierra que le había quitado estaba dispuesto a ser amigo de él porque la orilla de tierra no se la iba a llevar para el hoyo el día que muriese; que momentos antes de la muerte Rivera se afeitó en la barbería y su estado de ánimo era como el de siempre, pasando el rato con el barbero; que al día siguiente la víctima celebraba un bautismo en su casa, y que después de los tiros Túa huyó con unas gafas puestas que se quitó y el gabán en la mano que tiró debajo de un vehículo y en el bolsillo encontraron el sobrecito con las tabletas. La prueba de defensa fue la siguiente: Eulogio Seda declaró que la víctima iba caminando por A. Sanabria con una botella en la mano y al doblar la esquina notó que hizo "así" con la botella y dijo "toma, so

pillo", levantando la mano derecha con la botella. Entonces Túa le hizo unos disparos rápidos. Túa venía caminando y ambos estaban de frente. Estaba semioscuro. Cuando Loreto dijo esas palabras y levantó la mano se encontraba como a 20 ó 25 pies de Túa.

El policía Matías Alvarez dijo que en un mitin celebrado un sábado o domingo de julio de 1956 oyó a la víctima decirle en voz alta al apelante "tú eres un pillo, me robaste un pedazo de terreno", y que Túa caminó hasta unos policías y no supo si éstos intervinieron con Rivera.

Tomás Montalvo relató que iba con Rivera en el entierro del Lic. Colberg ese día y al pasarles Túa por el lado, quien también iba en el entierro, Rivera dijo "mira donde va ese pillo que me corrió los puntos". "Ese que va ahí me rodó los puntos pero eso no se va a quedar así". Que no se iba a quedar con esa que lo iba a matar, que eso no se iba a quedar así porque tan pronto lo cogiera lo iba a matar. El testigo se dio cuenta que Túa oyó eso. Más tarde le preguntó al apelante que qué le había sucedido con Rivera que estaba indignado y éste le dijo que eran pamplinas de Loreto, a lo cual el testigo le advirtió que tuviera mucho cuidado que les podía traer malos resultados.

El apelante declaró en su defensa. Después de relatar problemas e incidentes de colindancias con la víctima desde 1952, dijo que en el mitin celebrado ocho días antes Rivera le echó mano por el brazo y le dijo: "Tú eres un ladrón, un pícaro, te voy a entrar a tiros". Fue a la policía y se llevaron a Rivera. El día de los hechos se amaneció en el velorio del Lcdo. Colberg, estaba aletargado por la pérdida de la noche y le pidió las pastillas al farmacéutico. En el entierro oyó lo que Rivera le dijo a Montalvo y dijo que éste le había informado toda la conversación y que él corría ciento por ciento de peligro. Esa noche venía de su casa a buscar a su esposa; traía revolver porque tenía unas cuantas amenazas de Rivera y creía que su vida corría ciento por ciento

de peligro. Tan pronto lo vio Rivera a 18 ó 20 pies de distancia le dijo: "Toma, so pillo" y le vio un arma brillosa en las manos que no supo lo que podía ser. La víctima hizo un movimiento o ademán de tirarle con el arma brillosa y el apelante "peló" por su revólver y le hizo unos cuantos disparos corridos, como cosa de relámpago. Estaban como a dieciocho o veinte pies. Tan pronto la víctima dio vuelta el apelante se fue corriendo temiéndole a los hijos del interfecto que eran guapos y andaban armados. Se puso el revólver por encima de la correa y quedaba tapado con el gabán que llevaba en el brazo derecho. El último testigo de defensa y del juicio fue el Dr. Minsky. A su testimonio nos referiremos en breve. Esos son los hechos esenciales que aparecen del récord.

Los primeros tres errores son al efecto de que la Sala sentenciadora cometió error (1) al no permitir que el Dr. Minsky declarase o expusiese su opinión sobre la forma y manera en que ocurrieron las heridas, en cuanto a la posible trayectoria de las balas y en cuanto a la posición del cuerpo de la víctima al recibir esas balas, bajo el criterio erróneo del Juez que un perito médico no puede declarar sobre tales extremos. (2) Al indicar el Juez ante el jurado que las opiniones del testigo Dr. Minsky eran completamente especulativas; y (3) al formular el Juez ciertas preguntas al Dr. Minsky indicativas al jurado de su opinión en cuanto a la posible credibilidad de dicho testigo y en cuanto a la eficacia y el valor de su testimonio, usurpando el Juez las funciones del jurado.

El primer error no se cometió. El Dr. Minsky declaró sobre todo lo que la defensa deseó que declarara y él tuvo a bien contestar, a pesar de que se trataba de un testimonio claramente incompetente e inadmisible. En cuanto a los otros dos errores el récord demuestra que el certificado de autopsia incluía seis heridas de bala que en el curso de la prueba de cargo fueron descritas por el médico que la prac-

ticó, Dr. Jutzy, con sus orificios de entrada, de salida, la trayectoria de las mismas a través del cuerpo de la víctima y los órganos interiores que fueron interesados. Aclaró el Dr. Jutzy que él había enumerado dichas heridas de la una a la seis para la conveniencia de seguir el curso de lo que había encontrado. La defensa anunció al Dr. Minsky para hacerle preguntas hipotéticas. Con miras al informe de la autopsia que el testigo ya conocía con anterioridad, la defensa pidió al doctor que dijera al jurado en qué posición estaba el cuerpo que recibió esas balas en el momento del impacto de las mismas. Observó el testigo que si trataban de reconstruir cómo ocurrieron las heridas lo mejor sería señalar en el cuerpo del abogado la entrada y salida de dichas balas y así él podría demostrar *"cómo ocurrieron esas heridas."* El Juez preguntó si eso no resultaba especulativo y el testigo contestó que lo dudaba . . . , que podía ser especulativo pero iban a tratar de probar que era muy probable. El Fiscal le inquirió si ello era asumiendo él cual fue la primera herida que recibió la víctima y al decir el testigo que la primera fue en la mano el Fiscal hizo objeción fundada en que el médico no tenía base para determinar cual fue la primera herida de bala que recibiera el interfecto, argumentando que tendría que asumir la primera, después la segunda y las otras y eso era especulativo porque los cuerpos se podían mover. Al insistir la defensa en que para eso traía al perito para determinar pericialmente cual fue la primera bala que penetrara en el cuerpo, si la recibió de frente o hubo alguna inclinación, el Juez observó que ese no era un caso de peritaje médico y era completamente especulativo, dependiendo de las circunstancias bajo las cuales se recibieron los impactos y de la posición del cuerpo; y que eso no tenía que ver nada con peritaje médico. El Juez sostuvo la objeción del Fiscal. Mientras se discutía la misma no se solicitó que se retirara el jurado.

A pesar de haberse sostenido la objeción, correctamente a nuestro juicio, a preguntas de la defensa el testigo vertió el testimonio objetado:

. . . "Yo no puedo decidir si esta fue la primera bala; pero de todas maneras, en su trayectoria entró por aquí por el lado izquierdo, correspondiente a la cuarta costilla, y salió aquí; *después* el cuerpo recibió la *segunda* bala que salió por la tetilla; después *se viró* y recibió la *siguiente* bala aquí a diez centímetros al lado de la espina dorsal. Esta bala atravesó el páncreas, el estómago, el diafragma y el pericardio y salió debajo de la tetilla derecha; la *otra* entró por aquí, en el lado derecho de la espina dorsal y salió debajo del ombligo, *estando completamente virado, más virado el cuerpo que en la anterior*. La *última* entró por debajo de la escápula y salió por aquí. En mi opinión este cuerpo recibió una serie de balazos rápidos mientras tanto *estaba virándose* y cayendo. Esto es lo que yo puedo determinar según este reporte de autopsia."

Declarando que si se hubiera disparado estando el cuerpo en el suelo el que disparaba no podía estar frente al cuerpo en una posición fija sino que tenía que cambiar "permanentemente" la posición mientras iba haciendo los disparos: "Hon. Juez. P.—¿Y si el cuerpo se movía en el suelo según iba haciendo los disparos? R.—Podía ser, pero es que según la trayectoria en el cuerpo, en esta dirección, eso indica claramente un movimiento, señor Juez . . . Podía ser. P.—Igual que si se para de lado y así dispara de lado la persona que tiene el arma. Todo depende de la posición en que se pare y la superficie con que la bala haga impacto. R.—Correcto, muy correcto, señor Juez. . . . De todas maneras, si usted lo ve en esta trayectoria, que puede ser una especulativa como yo dije, esta todavía es muy probable según las distintas trayectorias y la manera que ocurrió." Al opinar que él dudaba que la víctima hubiera recibido las heridas en el suelo le preguntó el Juez que si para llegar a esa conclusión en cuanto a la forma en que él creía que este señor recibió los disparos había usado sus conocimientos de medicina y si esa deducción no pudo haberla hecho cualquier otra persona sin

conocimientos médicos. El testigo dijo que no podía hacerla sin tener conocimientos de anatomía y convino con el Juez en que era cuestión de hacer un análisis de la trayectoria de la bala de acuerdo con la posición del cuerpo. Después el doctor siguió declarando en forma hipotética sobre las diferentes trayectorias de disparársele a una persona en el piso desde distintas posiciones, concluyendo que dependían del movimiento del cuerpo y de la posición del revólver.

En la anterior situación, el segundo y el tercer error señalados tampoco fueron cometidos. En *Pueblo* v. *Bartolomei*, 70 D.P.R. 698 y más tarde en *Pueblo* v. *Díaz*, 74 D.P.R. 375, expusimos con bastante amplitud las normas propias de un juicio imparcial y justo que deben observarse por parte del magistrado que lo preside, en lo referente a su intervención en general, el hacer comentarios, preguntas a los testigos, el dejar ver al jurado su opinión en cuanto al crédito que éstos le merecen o tratando de desvirtuar su credibilidad, o su opinión en cuanto a culpabilidad, en fin, cualquier conducta suya que oscurezca la conciencia imparcial del proceso que él es, y debe representar, para presentarlo abanderizado a los intereses de cualquiera de las partes. Véase también *Pueblo* v. *Sanjurjo*, 73 D.P.R. 574. Cf: *Pueblo* v. *Matos*, 81 D.P.R. 508, págs. 516–517; *Valentín* v. *Torres*, 80 D.P.R. 463, pág. 482; *Pueblo* v. *Martínez* (Sentencia) 79 D.P.R. 586, opinión disidente del Juez Sr. Belaval con la cual estuvo conforme el señor Juez Presidente actual, págs. 593–595. Esas normas, que nunca dejarán de ser lo suficientemente ponderables, ni dejarán de ser lo suficientemente recordadas, no fueron quebrantadas en este caso. Se trataba de un testimonio pericial hipotético fundamentalmente especulativo y sin base racional, claramente incompetente e inadmisible, que partía de una premisa falsa. De la mera trayectoria de las balas en el cuerpo y del conocimiento de los orificios de entrada y de salida, toda la prueba que tenía ante sí, el testigo no podía razonadamente establecer la secuencia u orden de

las heridas ni la posición o movimientos de la víctima mientras las iba recibiendo. Este no era un testimonio pericial médico propiamente dicho, o sobre cosa en la que el jurado no hubiera podido formar su propia opinión sin ayuda pericial. *People* v. *Smith*, 29 P. 64, 93 Cal. 445; *People* v. *Milner*, 54 P. 833; *People* v. *Hill*, 48 P. 711; *People* v. *Fossetti*, 95 P. 384; *People* v. *Salaz*, 225 P. 777; *Crawford* v. *State*, (Ala.), 78 So. 2d 291; *Cobb* v. *State*, (Miss.) 83 So. 2d 833; *People* v. *Ernsting*, 112 P. 913; *People* v. *Overacker*, 115 P. 756. Los casos de *State* v. *Powell*, 78 S.E.2d 248 y *State* v. *Stanley*, 44 S.E.2d 196, a la luz de sus hechos no sostienen un principio en contrario.

■ La intervención del Juez, en esas circunstancias, tratando de evitar en lo posible con aclaraciones que un testimonio irracional e incompetente desorientara al jurado, no fue impropia aunque para ello hiciera reflexiones sobre este tipo de prueba. No pudo ser afectada la credibilidad de una evidencia intrínsecamente carente de credibilidad, que el apelante no tenía derecho a que fuera al jurado. Cf: *People* v. *Harris*, 198 P.2d 60, pág. 65.

En el cuarto señalamiento se imputa error a la Sala sentenciadora alegándose que instruyó en el sentido de que la ley dispone que debe presumirse la premeditación. En el sexto señalamiento se le imputa que erró al decirle al jurado que recae sobre el acusado el peso de la prueba para demostrar ausencia de malicia a los fines de reducir el delito a homicidio.

En cuanto a lo primero, la instrucción específicamente dada fue la siguiente: "La ley dice que debe presumirse que hay una premeditación, y si hay premeditación hace de ese caso, hace de ese acto, uno de asesinato. Naturalmente, asesinato en otro grado más bajo." Dicho así, la instrucción no sería del todo correcta, o cuando menos del todo completa. El artículo 199 del Código Penal (ed. 1937)—33 L.P.R.A., sec. 631—define el asesinato como el dar muerte ilegal a un

ser humano, con malicia y premeditación.(¹) Según el artículo 200 que le sigue,—sec. 632—"dicha premeditación"(²) puede ser expresa o tácita; y es expresa cuando "se manifiesta el propósito deliberado de quitar la vida ilegalmente a un semejante."(³) Se dice que es *tácita* cuando no resulta notable provocación, o las circunstancias que concurren a la muerte demuestran un corazón pervertido y maligno. Por otra parte, el artículo 247 del Código de Enjuiciamiento Criminal (ed. 1935)—34 L.P.R.A. sec. 726—estatuye que en los juicios por asesinato, *una vez probado que la muerte fue consumada por el acusado* será de la incumbencia de éste el probar que han mediado circunstancias atenuantes o que excusen el hecho, a menos que la prueba aducida por la acusación tienda a demostrar que el crimen cometido sólo reviste carácter de *homicidio* o que el acusado tenía justificación(*) o excusa.(⁴)

---

(¹) "With *malice aforethought.*"

(²) "*Such malice.*"

(³) "When *there is manifested a 'deliberate intention' unlawfully to take away* the life of a fellow-creature."

(*) La edición de 1935 usó equivocadamente "jurisdicción" y así aparece en L.P.R.A.

(⁴) El Art. 247 procede de California. Código Penal §1105. Allá se ha dicho que este artículo, tomado conjuntamente con nuestros artículos 199 al 201 del Código Penal, producen el efecto de que toda muerte es por ley asesinato, a menos que el acusado pruebe lo contrario. *People* v. *Todd,* 317 P.2d 40; 154 Cal.App.2d 601; *People* v. *Wells,* 76 P.2d 493, 10 Cal.2d 610. En este último caso se dijo que cuando se ha probado que la muerte la realizó el acusado, y nada más se demuestra, la presunción de ley es que fue maliciosa y un hecho de asesinato, pero en tal caso el veredicto debe ser de asesinato de *segundo* grado, y no de asesinato en primer grado. En él se cita de *People* v. *Jones,* 117 P. 176, 160 Cal. 358, al efecto de que la malicia es esencial al asesinato pero que por la sección 1105 (Art. 247) cuando se ha probado la muerte por el acusado se ha establecido asesinato, creándose así una situación particular de ley en que de la prueba de la muerte se establece el delito con su ingrediente de malicia y se transfiere el peso al acusado para probar un delito menor o justificación; y que por lo tanto, el efecto de este artículo, conjuntamente con el 199 es que la ley ha declarado expresamente que aunque el asesinato es la muerte con malicia premeditada, toda muerte es asesinato a menos que el acusado pruebe lo contrario.

Sin embargo, aun cuando hay algunas otras ·decisiones a tono con lo anteriormente dicho, expresándose en una que otra que al acusado le corres-

 Probado que un acusado ha perpetrado la muerte ilegal, no puede haber presunción de ley que actuó con malicia premeditada y cometió un asesinato hasta que él demuestre en contrario que se trata de un homicidio o que hubo justificación. No cabe entre nosotros tal interpretación del artículo 247, particularmente después que se elevó a orden constitucional la presunción estatutaria de inocencia del artículo 236 de Enjuiciamiento Criminal—34 L.P.R.A. sec. 715—.(⁵) Ante la disposición constitucional debe ser claro que bajo dicho artículo 247 al acusado le acompaña la presunción de inocencia en cuanto a todo elemento esencial del delito y no cambia el peso de la prueba en etapa alguna del proceso. Sólo vendría obligado a producir aquella prueba que establezca una duda razonable sobre su culpabilidad. Para una convicción de asesinato El Pueblo debe demostrar, más allá

---

ponde inclusive demostrar tales elementos de atenuación o excusa de manera preponderante, California ha sostenido inequívocamente y con criterio predominante que tal artículo sólo establece una regla de procedimiento que no releva al Estado de probar la culpabilidad, así como los elementos esenciales del delito de asesinato, más allá de duda razonable, no impone al acusado establecer dichas defensas con prueba preponderante porque ello lo privaría de la duda razonable a su favor, ni tampoco le impone la carga de la persuasión, ni cambia en etapa alguna el peso de la prueba, sino que meramente el acusado sigue adelante con prueba de elementos mitigadores, y que sólo tiene que ofrecer aquella evidencia que origine una duda razonable en cuanto a su culpabilidad. *People* v. *Hardy,* 198 P.2d 865; *People* v. *Valentine,* 169 P.2d 1; *People* v. *Deloney,* 264 P.2d 532; *People* v. *Cornett,* 198 P.2d 877; *People* v. *Carson,* 110 P.2d 98; *People* v. *Goldstein,* 99 P.2d 1069; *People* v. *Powell,* 25 P. 481; *People* v. *Bushton,* 22 P. 127. También se ha sostenido que esta disposición no se aplica en relación con los *grados* del asesinato, sólo a si la muerte es asesinato u homicidio (*manslaughter*) o si es excusable o justificable. *People* v. *Cornett,* supra. Algunos han sostenido que no se debe dar una instrucción en los términos de dicho artículo 247, a menos que se den explicaciones adecuadas al jurado en cuanto a su significado. *People* v. *Guldbrandsen,* 218 P.2d 977; *People* v. *Tuthill,* 187 P.2d 16; *People* v. *Lindley,* 161 P.2d 227; *People* v. *Thomas,* 156 P.2d 7. Véanse también: *Stokes* v. *People,* 23 N.Y.S. 167; *People* v. *Sandgren,* 98 N.E. 2d 460; *People* v. *Russell,* 194 N.E. 65; *People* v. *Yeager,* 182 N.Y.S. 2d 910; *People* v. *Elmore,* 14 N.E. 2d 451.

(⁵) Constitución, Artículo II, sección 11 "En todos los procesos criminales, el acusado disfrutará del derecho a ........, y a gozar de la presunción de inocencia." Cf: *People* v. *Wells,* 202 P.2d 53, p. 63; *People* v. *Scott,* 151 P.2d 517, p. 520–21.

de duda razonable, que además de perpetrarse la muerte por el acusado lo fue con malicia premeditada, sin que del hecho solo de la muerte le favorezca al Estado presunción de ley que le exima de probar todos los elementos esenciales del delito de asesinato. La malicia premeditada es un elemento *de hecho* a ser hallado por el jurado, pero siendo un ingrediente mental o subjetivo, allí donde no se ha manifestado la intención deliberada de quitar ilegalmente la vida le es permisible al jurado inferirla o deducirla como un hecho de los demás actos y circunstancias que rodean la perpetración de la muerte o relacionados con ésta, una vez instruido en ley que la malicia denota un acto dañoso e intencional, *sin justa causa o excusa*, en perjuicio de otro. El Pueblo, no obstante, viene obligado a producir aquellos hechos y circunstancias de donde el jurado pueda hacer una inferencia racional. Cf: *Pueblo* v. *Cruz*, 42 D.P.R. 916, 920–21; *Pueblo* v. *Méndez*, 74 D.P.R. 915, 928; *Pueblo* v. *Cortés*, 79 D.P.R. 818, 829; *State* v. *Steward*, 38 S.E.2d 29; *People* v. *Cartwright*, 305 P.2d 93; *People* v. *McAuliff*, 316 P.2d 381; *State* v. *Lamm*, 61 S.E.2d 188; *People* v. *Cole*, 301 P. 2d 854; *State* v. *Bowser*, 199 S.E. 31.

A pesar de lo expuesto, estamos convencidos que la instrucción así dada no pudo causar perjuicio sustancial al apelante. Fue dicha al comienzo mismo de unas extensas instrucciones en que posteriormente se instruyó minuciosamente sobre los elementos del asesinato en cada uno de sus grados que debían probarse.

En lo referente al sexto señalamiento de error, el apelante se queja que el Juez le impuso el peso de la prueba para demostrar una ausencia de malicia al instruir al jurado que "en el caso de homicidio las circunstancias bajo las cuales se da muerte a la víctima, debe demostrarse una ausencia de malicia, o sea debe demostrarse una ausencia de maldad" . . . Más adelante: "[N]aturalmente, les repito que un veredicto de homicidio se justifica solamente si ustedes quedan

convencidos que el acusado actuó sin que mediase malicia,
..." Aunque más propiamente debió decirse que un veredicto
de homicidio se justificaba si el jurado no quedaba convencido
más allá de duda razonable que el acusado actuó con malicia,
o si el jurado tenía duda razonable de que actuara con ma-
licia, la interpretación del apelante de que se le impuso el
peso de la prueba no se sostiene a la luz de otras instrucciones
sobre el particular. El Juez le hablaba al jurado en general
sobre la ley de homicidio y les instruía que en éste las cir-
cunstancias de la muerte debían demostrar ausencia de ma-
licia, lo cual es correcto. No se refería a la prueba en el
caso, ni a la de ninguna de las partes en particular.

 Con estas instrucciones sobre homicidio se relaciona
el séptimo señalamiento de error, en el que se alega que el Juez
instruyó sobre presunciones en contra de la existencia de
provocación y privó al jurado de su facultad de resolver como
cuestión de hecho en cuanto a tal extremo. Hemos exami-
nado la instrucción en que se basa el apelante, y la imputa-
ción carece de fundamento. El que el Juez dijera hablando
en términos generales que podía haber un homicidio "cuando
no hay prueba" que el acusado hubiera estado deliberando
y forjando la idea de matar no tuvo el efecto de indicar al
jurado que si había prueba en el caso sobre tales extremos,
ellos no podían considerar otra prueba sobre provocación.

 En el quinto señalamiento de error el apelante se
queja que se privó de la duda razonable y del beneficio de la
duda en cuanto a grados menores del delito al instruir el
Juez al jurado: "Si ustedes creen que los hechos ocurrieron
como los relataron los testigos de El Pueblo, eso, *sin lugar a
duda*, es un caso de asesinato en primer grado, de haber que-
dado demostrado los elementos de acecho,(6) deliberación y
premeditación." No hubo un error perjudicial. Si bien es

---

 (6) Aunque un testigo de cargo declaró que el apelante estaba "ñango-
tado" detrás de un dron y al acercarse la víctima le disparó, la acusación
no fue por la modalidad de la muerte perpetrada por medio de acecho, ni
se dieron instrucciones de ley en cuanto a este concepto.

cierto que los hechos según se relataron por los testigos de El Pueblo podían dar margen también a un veredicto de asesinato en segundo grado dependiendo que el jurado creyera a unos testigos de cargo y no a todos, y que, de cualquier modo compete al jurado establecer el grado del delito, el Juez aclaró de haberse demostrado los elementos de deliberación y premeditación. Momentos antes él les había dicho que venían obligados a rendir un veredicto de asesinato en primer grado si estaban convencidos que el acusado había dado muerte en forma deliberada y premeditada, que había pensado de antemano lo que iba a hacer, había velado a la víctima saliéndole de improviso y le había caído a tiros y lo mató.

La otra instrucción impugnada en este señalamiento presenta una situación más seria. "Si un individuo hace ostentación pública, o lo dice, que va a matar una persona y luego va y la mata, *no hay duda* que es un caso *claro y definitivo* de una muerte deliberada, de una muerte premeditada, de una muerte maliciosa, una muerte *que sin duda* hace de ese hecho un delito de asesinato en primer grado, *sin lugar a duda*". En las circunstancias de este caso tal exposición de la ley pudo ser seriamente perjudicial y confundir al jurado, sobre todo si se considera esta otra instrucción impugnada por el décimo señalamiento, dicha al final de las instrucciones refiriéndose al Juez ahora específicamente a los hechos del caso y al apelante: "Naturalmente, si ustedes creyeren que ya de antemano él venía con el propósito de matar al otro, si ustedes creyeren que venía ya con la idea hecha de matar al otro, no cabría *nada más* que un posible veredicto, *aunque hubiese alguna pendencia, alguna provocación:* asesinato en primer grado."

En las circunstancias de este caso, repetimos, estas instrucciones pudieron ser perjudiciales. Había prueba ante el jurado que el día anterior el apelante le dijo a una persona que si no le servía de testigo para demandar a Loreto

Rivera lo mataba como un perro, refiriéndose a la víctima; y al día siguiente lo mató. Ante esos hechos, de la manera categórica en que se dieron dichas instrucciones, sin lugar a dudas como un caso claro y definitivo de asesinato en primer grado, el jurado se sentía obligado a rendir únicamente este veredicto. Sin embargo, había prueba también ante el jurado, más cercano el momento de los hechos, de que la víctima había expresado que iba a matar al apelante tan pronto lo cogiera y lo había tratado de pillo y que el apelante oyó eso; que una semana antes la víctima le había dicho personalmente ladrón y pícaro y que le iba a entrar a tiros; y había prueba ante el jurado, ya en el momento de la muerte, del "toma, so pillo" acompañado de un movimiento de la mano de la víctima en la que tenía una botella que al apelante (no hay controversia que el sitio estaba oscuro o semioscuro) le pareció ser un arma brillosa.

■■■■■■ Ante toda la situación en el récord era de la exclusiva incumbencia del jurado según el convencimiento que en su ánimo produjera el conjunto de toda esa variedad de prueba después de pesarla y aquilatarla, el determinar si finalmente la muerte fue o no el resultado de deliberación y premeditación; si se perpetró en ejecución de una voluntad o intención de matar previamente deliberada y reflexionada, o si no obstante la expresión del matador del día anterior, la muerte respondió a circunstancias y hechos ocurridos o desarrollados posteriormente o a una provocación. Una provocación que resulta insuficiente para negar de un todo la malicia premeditada o crear duda razonable en cuanto a la misma, de modo de reducir el delito a homicidio, dijo la Corte Suprema de California en *People* v. *Thomas*, 156 P.2d 7, pág. 19, puede no obstante ser suficiente o adecuada para negar o crear una duda razonable en cuanto a la idea de deliberación y premeditación, dejando la muerte en asesinato en segundo grado. Cf: *People* v. *Barberi* (N.Y.) 43 N.E. 635. Según apuntamos en *Pueblo* v. *Palou*, 80 D.P.R. 364, pág. 384

(escolio 9), el asesinato en primer grado requiere un estado mental más específico que la malicia premeditada porque la voluntariedad, la premeditación y la deliberación que lo distinguen constituyen una combinación particularísima evidenciaria de un propósito específico de matar un ser humano. Véase *Pueblo* v. *Blanco*, 77 D.P.R. 767, en donde citando de California al efecto que la malicia premeditada y la deliberación y premeditación no son sinónimos, dijimos que una intención específica de matar no significa ni es equivalente a que la muerte ha sido ocasionada con premeditación y deliberación.

 El expresar que se va a dar muerte a otro es incuestionablemente un hecho afirmativo del cual el jurado puede determinar de manera expresa la malicia premeditada: —la manifestación de una deliberada intención de quitar la vida a un semejante, Cf: *People* v. *Gorshen*, 336 P.2d 492; *People* v. *Cox*, 153 P.2d 362; *People* v. *Greig*, 95 P.2d 936;— siendo la malicia premeditada ingrediente del asesinato tanto de primer como de segundo grado. Cf: *People* v. *Lewie*, 344 P.2d 861; *People* v. *Cayer*, 228 P.2d 70; *People* v. *Bender*, 163 P.2d 8. Tal manifestación puede también ser un hecho del cual el jurado infiera una muerte deliberada y premeditada,—característica sólo del asesinato en primer grado,—dependiendo de todos los demás hechos y circunstancias que aparezcan de la prueba; una muerte que requiere un proceso de reflexión y de pensamiento; darle vueltas al hecho en la mente, pesar la decisión de matar y las razones a favor y en contra de tal curso a seguir consciente de sus consecuencias, y una intención definida de matar resultado de tal proceso de reflexión y pensamiento. Cf: *People* v. *Robillard*, 358 P.2d 295; *People* v. *Carmen*, 228 P.2d 281; *People* v. *Honeycutt*, 17 P.2d 698; *People* v. *Bender*, supra; *People* v. *Thomas*, supra, *People* v. *Valentine*, 169 P.2d 1; *People* v. *Parrott*, 344 P.2d 643; *People* v. *Keeling*, 312 P. 2d 407. Era al jurado a quien correspondía resolver si lo

expresado por el apelante un día antes de dar muerte cons-
tituía o no a la luz de todos los hechos y circunstancias una
deliberación y premeditación, y de serlo, también le corres-
pondía determinar si la muerte fue o no el producto de dicha
deliberación y premeditación; o si no obstante lo manifes-
tado, lo fue sólo de malicia premeditada o si pudo responder
a otras circunstancias de las cuales había prueba en el ré-
cord. El determinar a cuál estado interior de la mente y
de la conciencia del matador respondió el acto de privar de
la vida en ese momento, era función exclusiva del jurado.
En este sentido las instrucciones señaladas invadieron esa
función. Aún cuando se instruyó en ley en cuanto al ase-
sinato en segundo grado y en cuanto al homicidio, en las
circunstancias de este caso, y tomando en cuenta además la
situación a la cual nos referiremos al considerar el decimo-
tercer señalamiento de error, dichas instrucciones pudieron
ser perjudiciales. Con lo anterior quedan considerados tam-
bién el octavo y el décimo señalamientos de error.

Discutidas unas excepciones por la defensa el Juez llamó
al jurado que ya estaba deliberando y le dio instrucciones
de nuevo en un esfuerzo por aclararles la anterior situación.
Hemos examinado dichas instrucciones y no podemos convenir
en que la situación quedara debidamente corregida. Aun-
que el Juez aclaró que si una persona tenía el temor de que
alguien la va a matar y se echaba encima un arma de fuego
e iba pensando que quizás podía verse envuelta en matar a
otro en defensa propia, esa no era la deliberación del asesi-
nato en primer grado, lo cual indudablemente le era bene-
ficioso al acusado, el Juez no obstante ratificó el concepto
anterior que si se había planeado de antemano matar, eso
era asesinato en primer grado repitiendo, *"aunque exista pe-
lea y aunque exista pendencia."* Probablemente el Juez se
refería a una pelea o a una pendencia que provocara el pro-
pio matador como parte de la ejecución de un plan ya pre-
concebido, pero como no había prueba alguna de que al

tiempo de matar el apelante iniciara una pelea o provocara a Rivera, la instrucción originalmente dada, repetida ahora, podía inducir al jurado a creer que se trataba de cualquier provocación o de cualquier pendencia, aunque la originara la víctima; y que de no creer justificada la defensa propia, no podía fijar el grado del delito considerando todos los demás hechos y circunstancias en torno a la muerte. (7)

En el noveno señalamiento se imputa error alegándose que se instruyó que si el acusado hubiese formado la pelea tal hecho eliminaba la posibilidad de una pendencia súbita y el que se redujese el delito a homicidio; en el undécimo se alega que se instruyó al jurado que si el acusado usó fuerza excesiva e innecesaria ello impedía un veredicto de homicidio, y en el duodécimo, se imputa que se instruyó que si el acusado había provocado la pelea él no tenía derecho a plantear la defensa propia. Hemos examinado las instrucciones sobre el particular y sustancialmente son correctas, si bien algunos conceptos en ciertos sentidos merecían ser cualificados. No es necesario discutir los alegados errores ya que hubo una total carencia de prueba de que en el momento de la muerte el apelante provocara en forma alguna a la víctima o iniciara una pelea o pendencia con ella. Aunque de ordinario se considera erróneo instruir sobre principios de ley aplicables a situaciones de hecho que no surgen de la prueba, Cf: *People* v. *Deloney*, 264 P.2d 532; *People* v. *Sánchez*, 184 P.2d 673; *People* v. *Silver*, 108 P.2d 4; cualquier error u omisión que pudiese haberse cometido sobre los extremos mencionados no afectaba el caso directamente.

No obstante, se dieron instrucciones de ley en relación con la teoría de la defensa propia, en la cual descansó el

---

(7) Al terminar estas instrucciones adicionales el presidente del jurado se anticipó a informar que ya habían llegado a un veredicto. El Juez les ordenó que regresaran a deliberar y dispuso que se les suplieran blancos adicionales por si tenían que hacer algún cambio. En la vista de una moción de nuevo juicio, celebrada posteriormente, se relevó que aquel veredicto era de asesinato en primer grado.

apelante, que en la situación que presentó la prueba que desfiló ante el jurado eran seriamente perjudiciales. Aún cuando dichas instrucciones no fueron objeto de un señalamiento de error, debemos considerarlas. [8]

Los artículos 52 y 54 del Código Penal—33 L.P.R.A., secs. 99 y 101—estatuyen que la persona contra quien se intenta algún daño podrá oponer la necesaria resistencia :".... (2) Para impedir una ofensa contra su persona, o su familia, o algún miembro de ésta." "El derecho a la propia defensa en ningún caso se extiende a la inflicción de más daño que el necesario al objeto." Para justificar un homicidio a base de la propia defensa, según el artículo 54 debe haber no sólo la creencia, sino también motivo fundado para creer que al tiempo de matar al interfecto el matador se hallaba en inminente o inmediato peligro de muerte o de grave daño corporal. Las circunstancias deben ser tales que produzcan en el ánimo de una persona razonablemente prudente la creencia que el acusado se hallaba en peligro de muerte o de grave daño corporal. Según el artículo 209 del Código Penal,—33 L.P.R.A. sec. 641,—podrá justificarse el homicidio cuando lo cometiere cualquier persona:.... (3) "en legítima defensa de dicha persona....." cuando hubiere motivo fundado para temer un propósito "de cometer un delito grave, o de inferir grave

---

[8] Ley de 12 de marzo de 1903. Este Tribunal "no se limitará solamente a infracciones de ley o quebrantamientos de forma, según fueren señalados, alegados o salvados por los litigantes, o según se hiciera constar en sus exposiciones y excepciones sino que con el más alto fin de justicia, el Tribunal puede también entender en todos los hechos y tramitaciones en la causa tal como aparecieron en autos, considerando en igual forma sus méritos para la mejor administración de justicia y del derecho, y evitar injusticias y demoras." Véase la Ley de 30 de mayo de 1904. "....Disponiéndose, sin embargo, que el tribunal de apelaciones podrá conocer de errores fundamentales que aparecieren en los autos, aun cuando no se hubiere interpuesto objeción a ellos, y fallar sobre los mismos con arreglo al derecho que de los hechos se desprendiere." Cf: *Pueblo* v. *Sanjurjo*, supra; *Pueblo* v. *Rosado*, 78 D.P.R. 436; *Pueblo* v. *Barrios*, 23 D.P.R. 831, pág. 838; *Pueblo* v. *Díaz*, 10 D.P.R. 466, pág. 473; *Rivera* v. *Sucn. Lugo*, 42 D.P.R. 189; *Reyes* v. *Reyes*, 76 D.P.R. 284, pág. 294; *Rivera* v. *Crescioni*, 77 D.P.R. 47, p. 75.

daño corporal, e inminente" peligro "de que tal propósito se realice". De acuerdo con el artículo 210—sec. 642—no bastará para justificar el homicidio el mero temor de la comisión de cualquiera de los delitos mencionados en los incisos 2 y 3 del artículo 209. Pero las circunstancias deben ser suficientes para excitar los temores de una persona razonable y el matador deberá haber actuado sólo bajo la influencia de dichos temores.

■■■ El Juez instruyó que debía existir una situación de peligro, una aparente situación de peligro para el acusado, no una mera sospecha; podía no existir un peligro real y verdadero y el matador, al enfrentarse a la situación, creer que estaba en inminente peligro de perder la vida o sufrir grave daño corporal. Instruyó igualmente que el juzgador debía situarse en la posición del acusado, y determinar a base del cuadro con el cual él se confrontó en ese momento si había base para que él temiese que su vida corría peligro o que estaba expuesto a recibir grave daño corporal de Loreto Rivera cuando le hizo los disparos. Lo anterior fue correctamente expuesto. La doctrina del peligro aparente rige en nuestra jurisdicción. Véase: *Pueblo* v. *León*, 53 D.P.R. 429; *Pueblo* v. *Chico*, 45 D.P.R. 500; *Pueblo* v. *Serrano*, 35 D.P.R. 335. Cf: *People* v. *Hatchett*, 146 P.2d 469; *People* v. *Vezerian*, 193 P.2d 944; *People* v. *Cornett*, supra; *People* v. *Glover*, 74 P. 745; *People* v. *Coleman*, 180 N.Y.S.2d 978; *People* v. *Herbert*, 61 Cal. 544; *State* v. *Ellerbe* (N.C.), 28 S.E. 2d 519; *Scott* v. *State* (Miss.), 34 So. 2d 718.

Pero de seguida se le dijo al jurado lo siguiente, que en la¬ circunstancias de este caso como cuestión de realidad prácticamente nulificó y dejó sin efecto la instrucción anterior:

"Naturalmente, eso *no es lo único* que se necesita para que pueda eximírsele de responsabilidad a una persona a base de la defensa propia. No es meramente que crea que su vida corría peligro y por ese solo hecho estar exento de responsabilidad.

Hay otros requisitos *que también deben concurrir* para que pueda eximirse de responsabilidad a un individuo.

"En primer lugar, usted está autorizado a hacer uso de violencia, de fuerza, *para rechazar una agresión;* usted está autorizado a hacer uso de la fuerza necesaria para rechazar esa agresión, o sea, usted no se puede aprovechar de una situación creada por la otra parte, para entonces usted infligir a la víctima más daño que el necesario para controlar esa situación. Por ejemplo, si un individuo me agrede a mi, un individuo del mismo físico mío, me ha agredido a mí con los puños, me da un puño o una bofetada, yo no estoy justificado en coger un revólver y vaciárselo encima, porque yo puedo rechazar la agresión en la misma forma que me agredió, la puedo rechazar con los puños. *De manera que si la persona se excede al rechazar una agresión y usa más fuerza que la necesaria para rechazar la agresión, se extralimita, no hay defensa propia, aunque inicialmente el individuo hubiese temido, por las circunstancias que se presentaban, que estaba expuesto a recibir grave daño corporal y hasta la muerte."* (Bastardillas nuestras.)

El Juez siguió instruyendo sobre los principios aplicables al uso de fuerza justificada para rechazar una agresión, y dijo:

"Si ustedes creen que los hechos ocurrieron como dijo el acusado o en forma análoga o parecida a como dijo el acusado, apliquen esos principios que yo les he dicho para ustedes determinar si ustedes creen que el acusado, cuando se confrontó con Don Loreto Rivera, a la distancia que él estaba del otro, en las circunstancias que estaba, por lo que él pudo observar, por los disgustos anteriores entre ellos, si él tenía fundado temor, si él estaba justificado que él, en ese momento, creyese que su vida corría peligro o que estaba expuesto a recibir grave daño de manos de Loreto Rivera. *En segundo lugar, ustedes deben determinar si el acusado no hizo uso de más fuerza que la necesaria para rechazar esa agresión.*

"Si ustedes creen que el acusado no se excedió, en caso que ustedes crean que *la agresión o el intento de agresión* partió de Don Loreto, si ustedes creen que el intento de agresión partió de Don Loreto, entonces ustedes deben determinar si el acusado se excedió o no se excedió al rechazar *esa agresión,* o si el acusado hizo uso de esa arma porque era necesario que hiciera uso de esa arma y le hiciera todos esos disparos a Don Loreto para

controlar *esa agresión,* o si, por el contrario, ustedes creen que el acusado se excedió, se extralimitó y sin necesidad ninguna le hizo esa serie de disparos al otro, a pesar de que el otro trató de iniciar *la agresión,* si ustedes creen que él se excedió, no hay defensa propia, y entonces habría uno de los tres delitos que les he dicho: asesinato en primer grado, asesinato en segundo grado u homicidio involuntario." (Bastardillas nuestras.)

Finalmente, al resumir los veredictos posibles, volvió a expresar el Juez:

"Y por último, si ustedes creyeren que el acusado actuó en defensa propia, si creyeren que el acusado le dió muerte a Loreto Rivera al confrontarse con una situación tal que él podía razonablemente temer, y cualquier persona de moderado valor en iguales circunstancias, hubiese temido, por las circunstancias que rodeaban las relaciones de estas dos personas, la forma que se encontraron y la conducta de él, que la vida del acusado corría peligro o que estaba expuesto a sufrir grave daño corporal, *y* ustedes creyeren que el acusado *actuó al rechazar una agresión o algún intento de agresión de Loreto Rivera contra el acusado,* si ustedes creyeren que el acusado no se excedió en hacer uso de más fuerza que la necesaria, más violencia que la necesaria, sino que rechazó *la agresión* en la forma que tenía que rechazarse, en la única forma que tenía que rechazarse, si ustedes creen que el acusado no se excedió, por lo menos ante el cuadro que se ha presentado ante sus ojos, que estaba justificado en *rechazar esa agresión* en esa forma, considerando los antecedentes habidos entre ellos, en ese caso ustedes lo deben absolver del delito de asesinato que se le imputa, igual que si tuviesen duda razonable y fundada en cuanto si el acusado actuó o no actuó en defensa propia." (Bastardillas nuestras.)

▬▬▬▬ Como hemos dicho, la instrucción sobre peligro aparente de perder la vida o de recibir grave daño corporal se ajustaba a derecho. Por separado, y como expresión abstracta de la ley, no eran incorrectas las instrucciones pertinentes al grado y medios de fuerza justificados para rechazar una agresión contra el matador. Fue error, no obstante, instruir al jurado que para que haya defensa propia como cuestión de ley, no basta con que la persona crea que su vida corre peligro, sino

que *deben concurrir* otros requisitos y referirse a la ocurren-
cia de una agresión. Nuestros preceptos de ley no requieren
tal concurrencia. Sólo exigen la creencia del matador, y que
exista motivo fundado para tal creencia, de que él se hallaba
en inminente e inmediato peligro de muerte o de grave daño
a su persona (Art. 54) ; motivo fundado para temer un pro-
pósito de cometer delito grave, etc., e inminente riesgo de que
el propósito se realice (Art. 209). El inminente riesgo de
que tal propósito se realice no requiere, imprescindiblemente,
de una agresión. Cf. *State* v. *Radon,* 19 P.2d 177, págs. 181;
*Sessums* v. *State,* (Tex.), 72 S.W. 2d. 249; *State* v. *Crutcher,*
(Iowa), 1N.W.2d. 195, pág. 198; *State* v. *Blackstone* (S.C.),
154 S.E. 161; *Scott* v. *State,* supra; *Puryear* v. *State,* (Tex.),
98 S.W. 258, pág. 264; *People* v. *Governale* (N.Y.), 86 N.E.
554; *McCampbell* v. *State,* (Tex.), 174 S.W. 345, pág. 348;
Cf: *People* v. *Rogers,* 331 P.2d. 163.

 Por supuesto, no basta con que un acusado crea, o
declare, que él se sentía en una situación o apariencia de peli-
gro inminente, y si él mata, asume su propio riesgo que un ju-
rado, como personas de moderada prudencia, no crean que se
hallaba en tal peligro ante los hechos y circunstancias desfi-
lados, ya que no es la sola creencia del matador, sino el que
una persona razonable y de moderado valor ante la misma
situación y ante los mismos hechos, hubiera estado justificada
en creerse en peligro de perder la vida.

 En las circunstancias de este caso en que el apelante
sólo descansó en la defensa propia ya que admitió haber dado
la muerte, y en que no hubo un encuentro de persona a persona
estando la víctima a alguna distancia de él al dispararle, las
referidas instrucciones tenían un mayor riesgo de ser grave-
mente perjudiciales. Si bien el Juez al instruir sobre el uso
de violencia asumió y partió de la base, aun cuando pudiera
haberlo hecho inadvertidamente, que el gesto o movimiento
del interfecto con la mano en que traía una botella constituía
una agresión, o intento de agresión, era al jurado a quien

correspondía determinar tal cosa. Si el jurado entendió, y cabe así presumirlo, que el Juez les instruía que aquello era una agresión, o intento de agresión, era obvio el que concluyera que se usó indebida fuerza para *repeler* la misma, en las circunstancias presentes. Si por el contrario creyó, resolviéndolo ellos, que no existía una agresión en el caso, de acuerdo con las instrucciones recibidas podía entender que no había defensa propia por no concurrir tal requisito, aunque pudiera ser de opinión, a la luz de otros hechos en el récord, que el apelante podía creer y había motivo fundado para él creer que se encontraba en peligro inminente de perder la vida o de grave daño corporal.

El décimotercer señalamiento de error se refiere a las instrucciones en general. Imputa que el Juez instruyó en forma tan enfática y argumentativa que demostraba su opinión en cuanto a los méritos del caso y el veredicto que debían traer. Entre otros planteamientos, alega el apelante que a través de las instrucciones se dio énfasis de manera preponderante al asesinato en primer grado, acentuándose este grado del delito. La cuestión hay que evaluarla tomando las instrucciones en su totalidad como un solo cuerpo o manifestación del Juez al jurado, no fragmentariamente ni por dichos y expresiones aislados. De ese modo igualmente, debemos pasar balance en cuanto al efecto de las mismas, perjudicial o no, a tal respecto. Con este principio cardinal en mente hemos hecho un aquilatamiento del problema planteado y aun cuando estamos convencidos que no hubo un propósito manifiesto o consciente del Juez de indicarle o sugerirle un determinado veredicto al jurado, nos inclinamos a creer que las instrucciones pudieron dar una sensación, o tener un efecto ante el jurado como el que les atribuye el apelante. (⁹) Sería prolijo exponer por-

---

(⁹) Posiblemente ello fue resultado, según expresara el propio Juez en una vista posterior sobre nulidad de veredicto y nuevo juicio, de que él dio largas y extensas instrucciones "que no fueron leídas sino mas bien en tono de conversación, tratando de hacer un esfuerzo por llevar al ánimo del jurado todos los conceptos del derecho para que ellos pudieran hacer

ciones específicas aunque se destacan en el récord y tendríamos que reproducir aquí prácticamente todas las instrucciones para dar una apreciación balanceada de las mismas. La exposición de la ley debe ser todo lo completa y clara que el jurado necesite pero no deben enfatizarse demasiado, más que otros, aquellos principios de derecho que caracterizan los elementos de un determinado delito o grado del delito cuando sean varios los incluidos. Hay el temor que el jurado entienda que ese delito o grado tiene preferencia en la mente del Juez. En un proceso de asesinato en primer grado aun cuando el jurado crea los hechos como surgen de la prueba de

---

verdadera justicia." Los hechos esenciales que desfilaron en este caso eran relativamente pocos y simples. Las instrucciones tienen el propósito fundamental de ilustrar al jurado sobre la ley aplicable a los hechos que han pasado ante ellos y proceden sobre todos aquellos principios de derecho a que concebiblemente dan lugar tales hechos, pero no equivalen a una disertación o tesis general sobre el caso. De ahí que de ordinario se consideran erróneas, aunque no siempre sean necesariamente motivo de revocación, instrucciones sobre principios de ley que aunque correctos en su exposición no sean aplicables a ninguna situación de hecho que surja o se infiera de la prueba, porque ello tiende a confundir al jurado. Se observa en este caso que se instruyó con bastante énfasis, inclusive cuando se dieron instrucciones adicionales, en cuanto a la situación en que un acusado que ha deliberado y se ha hecho el propósito de matar inicia una provocación o una pendencia con la víctima como parte de su plan preconcebido de darle muerte, y así aparentar que no cometió asesinato y sí un delito menor. No hubo prueba que el apelante iniciara una provocación o una pendencia con la víctima al tiempo de darle muerte pero el jurado podía sospechar, dado el énfasis con que se habló de esa situación, que en alguna forma esos hechos podían inferirse de la prueba. Con frecuencia, quizás más de lo aconsejable, se trató de ilustrar principios de derecho con ejemplos hipotéticos de hecho. Esto debe evitarse mientras sea posible ya que hay el peligro que el jurado crea que los hechos hipotéticos que usa el Juez en alguna forma se infieren o surgen de la prueba; que el jurado puede entender que el juez da por probadas ciertas situaciones de hecho si tienen parecido con las del ejemplo, o que la ilustración no contenga todas las situaciones de hecho a las cuales le sea aplicable el principio de ley que se ilustra. Es preferible dejar al jurado que deduzca a tenor de la prueba desfilada cuantas situaciones de hecho puedan caer bajo los principios de ley que han oido, y concluya sobre aquellas que dentro del marco de dichos principios a su juicio quedaron probadas. Cf. *States* v. *Haesemeyer*, (Iowa), 79 N.W.2d. 755, pág. 761; *Dees* v. *Commonwealth*, (Ky.), 314 S.W.2d 514, pág. 517; *People* v. *Jackson*, 268 P.2d 6, pág. 10; *People* v. *Roe*, 209 P. 560.

cargo, siempre es de su exclusiva potestad el determinar el grado del asesinato dentro de su también exclusiva función de apreciar los hechos y de resolver sus dudas.

El decimocuarto señalamiento imputa error al ordenarse al jurado que siguiera deliberando después de informar que habían llegado a un veredicto. Se refiere a lo sucedido cuando el Juez llamó al jurado para darle instrucciones adicionales. El decimoquinto señalamiento imputa error al permitirse que se divulgara dicho veredicto mientras se discutía una moción de nuevo juicio. No habremos de considerar estos señalamientos. Aparte de que no se discuten por el apelante, no es necesario dada la disposición del caso.

*Por el efecto acumulativo de todo lo anteriormente expuesto en esta opinión al discutirse los varios errores señalados, se concederá un nuevo juicio.*